STEWART J. PIKE AND NANCY S. PIKE, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5974–79, 8552–78, Filed May 20, 1982.
6684–79, 9531–79,
10097–79, 10348–79,
10350–79, 10533–79,
10552–79, 10586–79.

---

[1]Cases of the following petitioners are consolidated herewith: Gary J. Heidel, docket No. 8552–78; James L. Eschele and Charlene Eschele, docket No. 6684–79; Donald E. Behn and Helen J. Behn, docket No. 9531–79; Torao Mukai and Flora F. Mukai, docket No. 10097–79; John M. Moodie and Sue E. Moodie, docket No. 10348–79; Edgar K. Silva and Yolanda H. Silva, docket No. 10350–79; David S. Ferguson and Ikuko T. Ferguson, docket No. 10533–79; Edwin L. Ables and Lois C. Ables, docket No. 10552–79; and Marcus H. Ash and Patricia Ash, docket No. 10586–79.

*L. N. Nevels, Jr.*, for the petitioners.
*Jerome Borison* and *Claudia Jane Kelly*, for the respondent.

DRENNEN, *Judge*: Respondent determined the following deficiencies in petitioners' Federal income taxes:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 5974–79 | Stewart J. Pike and Nancy S. Pike | 1975 | $2,746.21 |
| 8552–78 | Gary J. Heidel | 1974 | 567.00 |
| 6684–79 | James L. Eschele and Charlene Eschele | 1975 | 1,095.00 |
| 9531–79 | Donald E. Behn and Helen J. Behn | 1975 | 1,610.89 |
| 10097–79 | Torao Mukai and Flora F. Mukai | 1975 | 2,068.00 |
| 10348–79 | John M. Moodie and Sue E. Moodie | 1975 | 2,205.00 |
| 10350–79 | Edgar K. Silva and Yolanda H. Silva | 1975 | 1,441.00 |
| 10533–79 | David S. Ferguson and Ikuko T. Ferguson | 1975 | 3,902.00 |

| 10552–79 | Edwin L. Ables and Lois C. Ables | 1975 | $926.17 |
| 10586–79 | Marcus H. Ash and Patricia Ash | 1975 | 706.16 |

After concessions, the issues for decision are:

(1) Whether petitioners are entitled to deduct as interest[2] amounts paid on loans used to purchase stock in subchapter S auto-leasing companies.

(2) Whether petitioners are entitled to deduct as interest amounts paid on leverage loans.

(3) Whether petitioners are entitled to net operating loss deductions derived from the subchapter S leasing corporations.

(4) Whether petitioners are entitled to a passthrough of investment tax credit from the subchapter S leasing corporations.

(5) Whether petitioners are entitled to deduct as interest amounts paid on loans used to purchase stock in acceptance corporations.

(6) Whether petitioners are entitled to deduct as interest amounts paid on stock subscription agreements.

To facilitate the disposition of the issues presented, the findings of fact and opinion will be combined.

### FINDINGS OF FACT AND OPINION

Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by reference.

All of the petitioners herein were residents of Hawaii at the time their petitions were filed. The parties have agreed that the evidence presented to the Court with respect to Stewart J. Pike (hereinafter Pike) and Nancy S. Pike, and Torao Mukai (hereinafter Mukai) and Flora F. Mukai[3] in regard to their claimed interest deductions, subchapter S losses, and investment tax credit will be equally determinative with respect to

---

[2]All interest is claimed to be deductible under sec. 163(a). All section references are to the Internal Revenue Code of 1954 as amended and in effect for the taxable years in issue.

[3]Pike and Mukai will sometimes hereinafter be collectively referred to as petitioners.

the other petitioners. Accordingly, only the relevant facts as to Pike and Mukai are set forth.[4]

## I. Auto-Leasing Plan

### A. BACKGROUND INFORMATION

This case involves two separate and distinct tax shelter plans promoted by Henry Kersting in which both Pike and Mukai were participants. The first tax shelter we will deal with is the "Auto-Leasing Plan." In somewhat condensed form, the plan was as follows:

Beginning in 1974, Henry Kersting (hereinafter Kersting) began promoting the auto-leasing plan. According to a brochure entitled "How To Use Your Car As a 'Tax Shelter,'" distributed to potential participants, including Pike and Mukai, the object of the plan was to place the taxpayer who was not engaged in a trade or business, in a position where through tax savings it would be possible to lease and drive a car absolutely free of charge. No out-of-pocket up-front payments were required of the participants—a Kersting company would loan them the necessary funds. The participants would pay auto rental to the leasing companies and interest to the Kersting company, some or all of which would be recovered through tax savings. The method involved converting nondeductible personal auto rentals into deductible interest payments and utilizing net operating losses generated by the subchapter S auto-leasing companies.

---

[4]The issues in this case arise out of numerous complex circulatory transactions between the taxpayers and numerous auto-leasing companies, acceptance corporations, and finance companies formed and controlled by Henry Kersting to promote and carry out his auto-leasing tax shelter plan. Under the plan, an investor could rent a new car every 2 years with no out-of-pocket cost by virtue of income tax savings resulting from interest and net operating loss deductions created under the plan. Most of these transactions were opened in 1975 which, with one exception (1974), is the only year we have before us. Many of the transactions were not closed until subsequent years and some of them were rolled over into different plans involving different corporations. The evidence consisted of 3 days of testimony and three stipulations of fact, which simply stipulated documents or copies thereof, many of which are very difficult to read. Since we have jurisdiction of the tax liabilities of the various taxpayers for the years 1974 and 1975 alone, we will not make findings of fact with reference to transactions occurring after 1975 except as necessary to understand an entire transaction which affects the tax liabilities of the taxpayers for 1974 and 1975. To do otherwise would only further confuse an already complicated set of facts.

The auto-leasing plan was inaugurated by Kersting's organizing and forming corporations to lease cars.[5] Ten individuals who had decided to participate in the auto-leasing plan would each become shareholders of a leasing company and lease a car from that company for a minimal rental. The leasing company would then take accelerated depreciation deductions on the cars and reimburse the participants for the expenses incurred in operating the cars, which it then would deduct as a business expense. The minimal income of the leasing company plus the inflated expenses would result in the leasing company's incurring net operating losses.[6]

To pass the net operating loss and investment tax credit through to the participants, the shareholders would elect for the leasing company to be taxed as a small business corporation. By deducting purported interest payments and applying his share of the net operating loss against his ordinary income, the shareholder would reduce his taxes in an amount which would reimburse him for some or all of the rental and interest payments he was required to make during the term of the lease.

The amount of stock each participant was required to purchase in the leasing company was determined by the purchase price of the automobile the participant decided to lease. Each participant would visit a car dealer to choose the type of car he wished to lease. The leasing company would purchase the car from the car dealer[7] and lease it to the participant. The participant would then buy at $1 per share an amount of shares equal to the cost of the automobile rounded off to the nearest $1,000 exceeding the cost of the automobile.[8]

---

[5]In all, Kersting caused at least 28 leasing companies to be incorporated in Hawaii between 1974 and 1976. Although Kersting was not a shareholder of these companies, he was president and director of all the various leasing companies.

[6]The tax shelter brochure made no representations regarding the profit potential of the leasing companies. In fact, one brochure stated that "we intend to generate losses." Pike and Mukai testified that they never saw this particular brochure.

[7]The purchases were financed either through a bank or GMAC. Because the leasing company was new and had no credit rating, the participant often took title to the car and took out the loan in his name. Subsequently, the leasing company took over the title and assumed liability on the loan and made all payments thereon. Presumably, the downpayment was supplied by the leasing company.

[8]For example, if the purchase price of the automobile was $4,500, the participant would be required to purchase 5,000 shares of stock at $1 per share.

The money to purchase the stock was loaned to the participant by one of Kersting's finance companies at 18-percent interest per annum. It was understood by the participants that this loan would not have to be repaid as long as the shareholder remained in the auto-leasing plan. If the shareholder decided to end his participation in the plan, the loan was canceled by the participant-shareholder's turning in his stock.

On the same day the stock purchase loan was made to the shareholder, a second loan (leverage loan) at 18 percent per annum from the same finance company was made to the shareholder to prepay for 1 year the interest on the stock purchase loan and the rental payments on the car.

The money received by the leasing companies for their stock was immediately invested by them in thrift certificates issued by the same finance company which had made the loans to the participants. These thrift certificates were payable after 3 years and bore deferred interest of 10 percent which was not payable until the due date of the certificate.[9]

The rental or lease rate at which the leasing company would lease the cars to the participants was based on a 3-year, 12-percent simple interest amortization schedule. In other words, if the leasing company was leasing a car that cost $5,000 to a participant, it would calculate the monthly payments necessary to pay off a $5,000 loan with simple interest at 12 percent, over a 3-year period, which in this case would be $166.08 per month. From this figure of $166.08, the leasing company would subtract the interest due on the shareholder's stock purchase loan, which in this case would be $75 per month.[10] The difference of $91.08 per month was the amount the shareholders paid per month for the lease of the car. By structuring the transaction in this manner, the participants could claim a $900 interest deduction for tax purposes each

---

[9]According to Kersting, the purpose of issuing these deferred interest certificates to the leasing companies was to assure that the leasing companies would show a profit in at least 2 of its first 5 years of existence, the fourth and fifth years when the accumulated interest was paid, to comply with the requirements of sec. 183(d).

[10]If the participant was leasing a car which cost the leasing company $5,000, the participant would have to purchase 5,000 shares of stock. The funds for this purchase of stock were borrowed from one of Kersting's finance companies at 18 percent for 3 years, yielding interest charges of $900 per year, or $75 per month.

year and were able to lease the cars for less than the fair rental value. The only out-of-pocket expenditures by the participants were monthly payments on the principal and interest on the leverage loans. As hereinafter noted, the total of the actual monthly rental payments, the monthly interest on the stock purchase loan, and the monthly interest on the leverage loan would about equal the fair monthly rental value of the car. Furthermore, these payments would be recovered through tax savings generated by the interest deductions and passthrough of net operating losses and investment tax credit. The subchapter S losses and resulting tax savings sufficient to drive a brand new automobile without any cost were purportedly to continue for as long as the participant continued in the auto-leasing plan, acquiring a new car every 2 years.

### B. PARTICIPANT'S INVOLVEMENT IN AUTO-LEASING PLAN

#### 1. Stewart J. Pike

During 1975, Pike, who was a stockbroker, learned about the auto-leasing plan through another stockbroker. Pike decided he would participate in the plan by leasing a car from, and becoming a shareholder in, Cerritos Leasing Co. (hereinafter Cerritos).

On March 17, 1975, Pike selected a 1975 Vega from Aloha Motors with a purchase price of $3,601.98. On March 18, 1975, Cerritos purchased the Vega from Aloha Motors.[11] Since the car had a purchase price of $3,601.98, Pike was required to purchase 4,000 shares of Cerritos at $1 per share. Pike borrowed the $4,000 to purchase this stock from one of Kersting's finance companies, Confidential Finance Co.[12] (hereinafter Confidential) at 18-percent interest per annum,[13] or $720 per year. Pike and Cerritos then entered into a lease of the Vega for 36 months at $56.17 per month, or $674.04 per year. Confidential then made a loan, hereinafter referred to as

---

[11]See note 7 *supra.*

[12]Kersting was president and director of Confidential. In addition, Kersting, members of his family, or corporations in which he or his family owned 100 percent of the stock, owned approximately two-thirds of the issued and outstanding shares of Colt Financial Corp., which owned 100 percent of Confidential.

[13]The proceeds of this loan were made payable to both Pike and Cerritos. Pike endorsed the check and turned it over to either Cerritos or Confidential.

a "leverage loan," to Pike for $1,394.04 with interest at 18 percent per annum, for Pike to use to prepay 12 months of the lease payments on the Vega to Cerritos ($674.04) and to prepay the first year's interest ($720) on the stock purchase loan to Confidential.[14] Pike was sent a stock certificate for 4,000 shares of Cerritos dated March 18, 1975.[15]

Finally, in July of 1975, Cerritos sent Pike an unsigned check for $692.32 to reimburse Pike for his costs of operating the Vega, including gasoline. Pike was instructed to endorse the check and return it to Cerritos so that it could be credited to his account as an additional contribution to capital. Pike complied with this requirement.[16] The fair rental value of the Vega was approximately $130 per month.[17] The only money actually expended by Pike during 1975 that he did not borrow from Confidential or some other Kersting company was the partial repayment of the leverage loan of $1,394.04[18] plus interest at 18 percent thereon for 8 months of $167.28.[19] For the taxable year 1975, Pike deducted $720 of interest paid on the stock purchase loan and $167.28 paid on the leverage loan, which respondent disallowed.

## 2. Torao Mukai

The salient facts in Mukai's case are essentially the same as those in Pike's. Mukai, after discussing the tax advantages of the auto-leasing plan with his son-in-law, decided to participate in the plan by leasing a car and becoming a shareholder in Delta Leasing Co. (hereinafter Delta).

---

[14]Confidential prepared two two-party checks. The first check was for $674.04 made payable to Pike and Cerritos to prepay 1 year's lease payments on the Vega, and the second check was for $720 made payable to Pike and Confidential to prepay the first year's interest on the stock purchase loan executed between Pike and Confidential; Pike endorsed both checks and returned them to Confidential.

[15]Although the stock certificate was dated Mar. 18, 1975, Cerritos was not incorporated until Mar. 21, 1975.

[16]The $692.32 Pike purportedly received for reimbursement of his operating expenses exceeded his total car rental payments of $674.04 for 1975.

[17]Our determination of the fair rental value of the Vega was based on the Automotive Leasing Guide which states that the fair rental value was $132.34 per month and upon the testimony of Mr. Gutcher, respondent's expert, a reliable and competent witness, who testified that the fair rental value was $126.30 per month.

[18]It is not clear how much of the $1,394.04 loan Pike paid off in 1975.

[19]$1,394.04 times 18-percent interest per annum equals $250.92, or $20.91 per month times 8 months equals $167.28.

Mukai selected a 1975 Buick Skylark from Schuman Carriage Co. with a purchase price of $5,718.74, which Delta then purchased.[20] Since the car had a purchase price of $5,718.74, Mukai was required to purchase 6,000 shares of Delta stock at $1 per share. Mukai borrowed the $6,000 to purchase this stock from Confidential at 18-percent interest per annum.[21] Mukai and Delta then entered into a lease of the Buick Skylark for 36 months at $93.93 per month, or $1,127.16 per year. Confidential made a leverage loan to Mukai for $2,207.16 with interest at 18 percent per annum to prepay 12 months of the lease payments on the Buick Skylark to Delta ($1,127.16) and to prepay the first year's interest of $1,080 on the stock purchase loan to Confidential.[22]

Finally, on July 22, 1975, Delta reimbursed Mukai for all his expenses in operating the Skylark in 1975, including gasoline, in the amount of $76.17. Delta sent an unsigned check for $76.17 to Mukai with instructions to endorse it and return it to Delta so that it could be redeposited as an additional contribution to capital in his behalf; Mukai complied with this request.

The only money expended by Mukai during 1975 that he did not borrow from Confidential or some other Kersting entity was the repayment of the leverage loan of $2,207.16 plus interest at 18 percent for 1 year, or $397.28.[23]

The fair rental value of the Buick Skylark leased by Mukai was approximately $190 per month.[24] Mukai at the time of trial was still a shareholder in Delta or its successor and consequently has never paid off the stock purchase loan. In

[20]We assume this car was purchased in the same manner as Pike's car was purchased, i.e., by using an independent financing agency; and that the $6,000 paid to Delta for its stock was invested by it in a thrift certificate issued by Confidential.

[21]$6,000 times 18 percent equals $1,080.

[22]Confidential prepared three two-party checks payable to Mukai and Delta or Confidential. The first check was for the proceeds of the stock purchase loan in the amount of $6,000 payable to Mukai and Delta. The second was for $1,127.16 made payable to Mukai and Delta to prepay 1 year's lease payments on the Skylark. The third check was made payable to Mukai and Confidential for $1,080 to prepay the first year's interest on the stock purchase loan executed between Mukai and Confidential. Mukai endorsed all three of these checks and returned them to Confidential and was sent a certificate for 6,000 shares of Delta stock.

[23]It is not clear whether Mukai has repaid the $2,207.16 leverage loan, although it is clear he has paid the interest thereon of $397.28 ($2,207.16 × 18% = $397.28).

[24]Our determination of the fair rental value of the Skylark was based upon the Automotive Leasing Guide and Mr. Gutcher's testimony, which both show the fair rental value of the Skylark to be $197 per month.

addition, Mukai has not paid or received demands for its payment.

It is apparent from an analysis of the various steps in the auto-leasing plan, which was managed and controlled by Kersting, that when the circle was complete, Confidential had received back all the money that it momentarily had placed in circulation. It also received interest on the leverage loans and an inventory of receivables (loans) that could increase its deductions for bad debts.

### C. OPINION

### 1. Interest Deduction

Petitioners assert that they are entitled to deduct the interest paid on the stock purchase loan and the leverage loan under section 163(a).[25] Respondent counters that petitioners are not entitled to the deduction for the interest paid on the stock purchase loan or on the leverage loan because first, there was no payment, second, there was no real indebtedness, and third, the interest paid by petitioner was in reality either auto rental or a fee paid for the right to participate in the auto-leasing plan tax shelter.

As to the interest paid on the stock purchase loan, we agree with respondent that the amounts paid were not actually interest and that there was not a real indebtedness; accordingly, the amounts purportedly paid as interest on the loan are not deductible. As to the interest paid on the leverage loans, we hold that these amounts are also not deductible since petitioners have not met their burden of proof to show that such amounts were really paid as interest. Due to our holding herein, it is unnecessary to decide the other issues raised by respondent.[26]

---

[25]Mukai deducted these amounts on his return for 1975. Although the record is less than clear, we believe that Mukai actually did pay at least part of these amounts in 1975.

[26]We have found no case factually similar to this case. However, many of the cases we cite, and others, have also involved schemes designed to create tax deductions, particularly of interest, which were so lacking in substance that the courts have held they would not support an interest deduction, despite the appearance of doing so. We think this is such a case and that we could deny petitioners and the auto-leasing companies the interest deductions they have claimed for any one or all of the reasons relied on by respondent. However, it would take too much time and space to discuss them all so we have chosen the one argument we think is most applicable to each of the issues involved.

Section 163(a) provides that "there shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." An indebtedness pursuant to section 163(a) "means an existing, unconditional, and legally enforceable obligation for the payment of money." *Kovtun v. Commissioner*, 54 T.C. 331, 338 (1970), affd. 448 F.2d 1268 (9th Cir. 1971); *Titcher v. Commissioner*, 57 T.C. 315 (1971). The real purpose and intention of the parties is controlling and the form of the transaction will be looked through to determine the real character of the payment called for. *Knetsch v. United States*, 364 U.S. 361 (1960); *Beck v. Commissioner*, 74 T.C. 1534 (1980), on appeal (9th Cir., Jan. 22, 1981); 4A J. Mertens, Law of Federal Income Taxation, sec. 26.04, at 22 (1979). Where transactions lack substance and are entered into solely to form the basis of a tax deduction, they need not be recognized. *Goodstein v. Commissioner*, 30 T.C. 1178 (1958), affd. 267 F.2d 127 (1st Cir. 1959); *Battelstein v. Internal Revenue Service*, 611 F.2d 1033, 1035 (5th Cir. 1980). Whether the stock purchase loans created a bona fide debt is a question of fact, the burden of proof of which is on petitioners. Rule 142(a), Tax Court Rules of Practice and Procedure; see *McSorley's Inc. v. United States*, 323 F.2d 900, 901–902 (10th Cir. 1963).

It is clear that the interest paid on the stock purchase loans was in economic reality a part of the rental payments for the lease of the automobiles. The leasing companies computed the amount they would charge the participant for leasing the automobile and then deducted from this the amount the participants were purportedly paying as interest. The obvious purpose for doing so was to generate an interest deduction for the participants in place of nondeductible auto rentals. Also, a comparison of the amount of lease payments with the fair rental value of the cars supports this conclusion. The fair rental value of the Vega leased by Pike was approximately $130 per month. The fair rental value of the Skylark leased by Mukai was approximately $190 per month. However, Pike paid only $56.17 per month and Mukai paid only $93.93 per month in car rentals. But when the purported interest payments on the stock purchase loans are combined with the monthly lease payments, Pike was paying $116.17 per month, and Mukai was paying $183.93 per month. Where the circumstances of the case establish that the payments of interest

were made as part of the consideration for the lease of the automobile, then they constitute additional rent, and such fact is not changed merely because the parties labeled the payments as interest. *Holden v. Commissioner*, 27 B.T.A. 530, 537 (1933).

Furthermore, when we consider all the facts and circumstances, we do not believe the stock purchase loans created a bona fide loan or obligation from Pike and Mukai to Confidential. It was understood that petitioners would not have to repay the loans as long as they participated in the plan. It was also understood that if they terminated their participation, they could simply turn in their stock and the stock purchase loans would be canceled. Confidential was not out of pocket any cash because it simultaneously received the amount of the stock purchase loan from the leasing company as an investment in a thrift certificate upon which neither principal nor interest was due for 3 years. Because Kersting was president of both Confidential and the leasing companies, it is difficult to determine from his testimony precisely which company would bail a participant out in the event of his termination. It is our understanding of the evidence, however, that on paper, at least, if a participant wanted out he would surrender his car and his stock to the leasing company, Confidential would redeem the thrift certificate held by the leasing company, the redemption funds would be paid to the participant for his stock, which he then would pay to Confidential in payment of the stock purchase loan. We assume this rotation of funds was carried out by mere bookkeeping entries. But in any event, under no circumstances were the participants required to repay the loan with their own funds.[27]

In addition, we do not believe petitioners had any business or profit-making objective in buying stock in the auto-leasing companies, except to fill out Kersting's scheme to convert auto rental into interest payments. Neither of them was in any way related to the automobile business, and they could hardly have had a sincere investment motive in buying the stock. Not only did Kersting's explanation of the plan state that the leasing companies would generate operating losses, but a cursory

---

[27]The evidence indicates that neither Pike nor Mukai has paid or ever been requested to pay either the principal or any additional interest on his stock purchase loan.

analysis of their proposed income and expenses under the original plan would indicate that they had no prospects for making a profit; nor can it be said that they bought the stock to provide the leasing companies with funds to purchase the automobiles. The funds were not used for that purpose; instead, they were turned over to Confidential in exchange for deferred-payment thrift certificates. So the step in Kersting's plan which required petitioners to borrow money from Confidential at 18-percent interest to buy the stock in the leasing companies had no business purpose for petitioners except to produce a tax deduction. As pointed out in *Gregory v. Helvering*, 293 U.S. 465, 469 (1935), although a taxpayer is entitled to minimize his taxes by lawful means, the steps he takes to do so must have a valid business purpose, apart from tax-saving motives.

We therefore conclude that the purported interest payments by Pike and Mukai on the stock purchase loans were in fact a part of the rental payments for use of the automobiles and as such were nondeductible personal expenses under section 262.[28]

As to the interest paid on the leverage loans, we find that petitioners have not met their burden of proof to show that the payments were really for interest instead of hidden car rental payments or hidden fees charged to join the auto-leasing car tax shelter.

Interest on indebtedness, within the meaning of section 163(a) is generally defined as compensation for the use or forebearance of money. *Deputy v. du Pont*, 308 U.S. 488, 498 (1940). Where a transaction calling for the payment of interest lacks substance and is entered into solely to form the basis of a tax deduction, it need not be recognized as such. *Goodstein v. Commissioner, supra; Beck v. Commissioner, supra; Battelstein v. Internal Revenue Service, supra.* Petitioners have the burden of proving that the interest they paid on the leverage loans was actually interest on indebtedness rather than a subterfuge to create additional tax deductions, as claimed by respondent. See *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a).

The loans on which the interest in question was paid were

---

[28]The automobiles rented by Pike and Mukai were for personal use and were not used in a trade or business or for the production of income.

the leverage loans to Pike and Mukai. At the same time he entered into the stock purchase loan, Pike purportedly borrowed $1,394.04 from Confidential, $674.04 of which was used to prepay 12 months' car rental to Cerritos and $720 of which was used to prepay Confidential the interest on the stock purchase loan. Pike paid $167.28 interest on this leverage loan in 1975. Mukai purportedly borrowed $2,207.16 from Confidential, of which $1,127.16 was used to prepay 12 months' car rental to Delta and $1,080 of which was used to prepay Confidential interest on the stock purchase loan. Mukai paid $397.28 on this leverage loan in 1975.

Petitioners were not required to prepay the rental under the terms of the auto leases and were not required to prepay interest on the stock purchase loans, and we perceive no reason they should have borrowed money to do so except for tax purposes. There was apparently no direct tax advantage in prepaying the rental, but it did add some viability to the leasing companies and gave them funds with which to reimburse petitioners for the expenses of operating their autos, which the leasing companies then deducted as operating expenses. But the prepayment of interest to Confidential on the stock purchase loan did generate for petitioners a claim for a full year's interest deduction for 1975 in lieu of a nondeductible auto rental expense. Except for the fact that it was part of Kersting's plan, it would have been ludicrous for petitioners to borrow money from Confidential at 18-percent interest and on the same day borrow additional money from Confidential at 18 percent to prepay a year's interest on the first loan. While we recognize that it is not required that interest be ordinary and necessary to be deductible under section 163(a), it still must be actually paid on indebtedness. *Deputy v. du Pont, supra.*

Since there was no reason for petitioners to borrow this money, we are not convinced that these leverage loans created an actual indebtedness or that the purported interest payments were actually intended to be interest. Petitioners never had possession or control of the money. Confidential gave petitioners two checks, one payable to a petitioner and his leasing company, and the other payable to a petitioner and Confidential, with instructions to endorse the checks and return them to Confidential, which they did. Petitioners were never in a position to cash or use the checks, except for

prepayment of amounts they were not obligated to make. See *Karme v. Commissioner*, 73 T.C. 1163 (1980), affd. 673 F.2d 1062 (9th Cir. 1982); *Beck v. Commissioner, supra.* Confidential was never without the use and possession of the leverage loan funds. We agree with respondent that the purported interest payments on the leverage loans were either fees to Kersting to be permitted to participate in the plan or additional rental on the automobiles.[29] As such, they are not deductible by petitioners.

## 2. Net Operating Losses

At the time Pike and Mukai invested in Cerritos and Delta, Kersting presented them with a summary of tax deductions, tax losses, and tax refunds they could expect to receive by participating in the leasing companies. Net operating losses in 1975 for Pike were estimated to be $4,000 from Cerritos, and for Mukai, $5,000 from Delta.

The money Cerritos and Delta received from their shareholders as capital contributions and prepaid lease rentals was invested by them in 10-percent, 3-year deferred-payment thrift certificates (promissory notes) with Confidential. The thrift certificates required that the interest be paid on the date the principal was due, with Confidential retaining the right to redeem the notes at any time prior to maturity. The promissory notes did not provide for the forfeiture of interest if Confidential redeemed the notes prior to maturity.

In 1977, the thrift certificates were either redeemed or canceled by Confidential, all the interest accumulated to that date was forfeited and, as such, none of the leasing companies received any interest on the thrift certificates.[30]

---

[29]After recharacterizing the interest on the stock purchase loans paid by Pike and Mukai as car rental payments, Pike and Mukai were found to be paying $116.17 and $183.93 per month to lease their automobiles, which is still below the fair rental value of $130 and $190 per month. If the interest paid on the leverage loans is added to the car rental payments, Pike would be paying an additional $20.91 per month ($167.28 ÷ 8 months) for a total of $137.08 per month, and Mukai would be paying an additional $33.11 per month ($397.28 ÷ 12 months) for a total of $217.04 per month, which closely approximates what we have found to be the fair rental value of the automobiles.

[30]In 1976, because, according to Kersting, the Internal Revenue Service started auditing the leasing companies in the auto-leasing plan discussed above, Kersting inaugurated the Universal leasing plan. Universal was not a subchapter S corporation. Cerritos and Delta and other leasing companies apparently transferred their automobiles to Universal which

Cerritos was incorporated in the State of Hawaii on March 21, 1975. Sometime subsequent to November 3, 1975, it filed a Form 2553 to be effective as of November 1, 1975, to be taxed as a small business corporation. Delta was incorporated in the State of Hawaii on April 18, 1975, and filed an election to be taxed as a small business corporation, Form 2553, to be effective as of December 1, 1975. During 1975, Cerritos and Delta both incurred net operating losses, pro rata shares of which were claimed as deductions by Pike and Mukai on their 1975 returns. Respondent disallowed the net operating loss deductions to petitioners.

Respondent contends that petitioners are not entitled to deduct the net operating losses of the leasing companies for several reasons. First, he contends that Cerritos and Delta were not operated for the purpose of making a profit and as such their operations do not constitute a trade or business for which deductions are allowable under sections 162, 167, and 183(a). Additionally, he asserts that Cerritos and Delta (and thus petitioners) are not entitled to interest deductions otherwise allowable under section 183(b) because the indebtedness was not genuine and no interest was paid. Second, respondent contends that the net operating losses are not allowable under section 269. Third, respondent asserts that Cerritos and Delta were not "electing small business corporations" as defined by section 1371(b) and as such, cannot pass through their purported losses to their shareholders. Finally, respondent asserts that petitioners have no bases or stockholders' interests in the subchapter S corporations and accordingly are not entitled to the net operating losses of the subchapter S corporations

---

assumed liabilities relative thereto. The participants, including Pike and Mukai, were simply notified in 1976 that they were now participants in the Universal plan, which continued very much along the lines of the auto-leasing plans, except Universal occasionally issued dividends "to its stockholders" to refinance their loans, which dividends were immediately returned to one of the Kersting companies. Since these transactions occurred after 1975, the primary year over which we have jurisdiction, we will not go into them. However, it is not clear just what happened to Cerritos and Delta. No accounting was made by them to their stockholders. Neither Pike nor Mukai was called upon to pay the stock purchase loan or any balance on the leverage loans. There is some evidence that the thrift certificates presumably issued to the leasing companies were transferred to Candace, another corporation formed by Kersting, and were then redeemed—but no interest was paid. On the other hand, there is evidence that as of Dec. 31, 1977, Confidential wrote off as bad debts, and deducted for tax purposes, all the loans due Confidential from the leasing companies on their lines of credit and from the shareholders of the leasing companies on their stock purchase loans.

under section 1374. We agree with respondent's last contention.[31] Due to our holding, it is unnecessary to decide the other issues raised by respondent.[32]

Section 1374(a) provides that the net operating loss of an electing small business corporation shall be allowed as a deduction from gross income of the shareholders of such corporation. Section 1374(c) provides, as a limitation, that a shareholder's portion of the net operating loss shall not exceed the sum of (A) the adjusted basis of the shareholder's stock in the corporation, and (B) the adjusted basis of any indebtedness of the corporation to the shareholder.

The report of the Committee on Finance states that the purpose of this section is as follows:

> The amount of the net operating loss apportioned to any shareholder pursuant to the above rule is limited under section 1374(c)(2) to the adjusted basis of the shareholder's *investment* in the corporation; that is, to the adjusted basis of the stock in the corporation owned by the shareholder and the adjusted basis of any indebtedness of the corporation to the shareholder. * * * [1958-3 C.B. 1141; emphasis added.]

The use of the word "investment," reveals an intent, on the part of the committee, to limit the applicability of section

---

[31]For reasons discussed *supra*, relative to the investment tax credit, we agree with respondent that Cerritos and Delta were not operating for profit and consequently were not engaged in a trade or business. As indicated in Kersting's promotional literature, the leasing companies were used to take advantage of various tax deductions which the individual participants could not claim. These included accelerated depreciation, investment credits, expenses of operating and maintaining the automobiles, and operating losses, all of which would be passed through to the stockholders.

In several of his arguments, respondent asserts that Cerritos and Delta were not qualified as subchapter S corporations for 1975 because they did not file timely elections under sec. 1372(a). The evidence appears to support this argument but respondent does not press it because the subchapter S election issue was not raised in all of the notices of deficiency issued to all of the petitioners in these consolidated cases.

[32]The net operating losses of Cerritos and Delta were generated primarily due to the fact that the leasing companies were charging well below fair market value for the automobiles, because the leasing companies were reimbursing the lessees for their costs of operating the cars, which reimbursement sometimes exceeded the total lease payments the leasing companies received, and because the leasing companies borrowed substantial sums of money from Confidential and other Kersting-controlled companies at 18-percent interest per annum. At trial and on brief, respondent spent a considerable amount of time attacking the validity of these various transactions which generated the net operating losses. Due to our holding herein that petitioners had no adjusted bases in their stock, it is unnecessary for us to decide whether Cerritos and Delta had in fact generated net operating losses. Thus we have omitted any discussion of the facts relating to the validity of the various transactions entered into by Cerritos and Delta.

1374(c) to the actual economic outlay of the shareholder in question. *Perry v. Commissioner*, 54 T.C. 1293, 1296 (1970).

In the instant case, petitioners did not have an investment in the subchapter S corporations, either through stock investment or in indebtedness of the corporation. While at first glance it appears that petitioners purchased their stock in Cerritos and Delta and thus made an investment in the corporations, upon closer examination it is clear that this was not the case. Petitioners obtained the funds necessary to purchase their stock from Confidential. As discussed, *supra*, petitioners at all times understood that they would not have to pay this money back. Accordingly, petitioners never made an actual economic outlay, nor will they ever have to do so.[33] Furthermore, we note that Cerritos and Delta never really had the use of the funds. Shortly after they received the funds, they immediately reinvested them in 10-percent thrift certificates with Confidential. The interest on these thrift certificates was later forfeited, and the amounts due the leasing companies were never repaid and have been written off as bad debts.

We also note that the checks paid to petitioners as reimbursement for their car-operating expenses did not increase their adjusted bases. Petitioners were never actually reimbursed for their car expenses. The checks were sent to petitioners unsigned with instructions to endorse them and return them to the leasing companies. Petitioners' adjusted bases in their stock were then purportedly increased by the amount of the checks. By sending the checks unsigned, the leasing companies insured that petitioners could never negotiate the checks and receive payment thereon. It is obvious that petitioners never received any payment whatsoever and therefore did not, by endorsing the checks and returning them to the leasing companies, make a contribution to capital. The whole arrangement was merely a sham designed by Kersting in an attempt to permit the leasing companies to deduct the operating expenses of the automobiles and to give petitioners greater adjusted bases to claim net operating loss deductions.

---

[33]We note that this is not a case where the funds were borrowed from an independent third party, guaranteeing that the funds would actually have to be repaid. See *Underwood v. Commissioner*, 535 F.2d 309, 312 n. 2 (5th Cir. 1976), affg. 63 T.C. 468 (1975).

Based on the foregoing, we conclude that no investment was ever made by petitioners in Cerritos and Delta, that their stock basis was zero, and therefore they are not entitled to deduct the net operating losses, if any, suffered by Cerritos and Delta.

### 3. Investment Tax Credit

During 1975, Cerritos and Delta both purchased automobiles to lease to their shareholder-participants. Cerritos and Delta each claimed an investment tax credit with respect to the purchased cars, which was then passed through to their shareholders. Pike's and Mukai's shares of the investment tax credit were $144.73 and $233, respectively, which respondent disallowed.

Respondent asserts that petitioners are not entitled to the investment tax credit because first, Delta and Cerritos did not make a timely election under section 1372(a) to be taxed as a small business corporation; second, Cerritos and Delta did not acquire or hold any section 38 property since the useful life of the automobiles was only 2 years in the leasing companies' hands; third, the investment tax credit claimed by petitioners is not allowable under section 269; fourth, the investment tax credit is not allowable to petitioners since they had no adjusted basis in either the stock of, or indebtedness from, the subchapter S corporations pursuant to section 1374; and fifth, Cerritos and Delta were not operated for profit. Thus, respondent asserts, the automobiles were not used in a trade or business and therefore Cerritos and Delta were not entitled to an investment tax credit on the purchase of the automobiles which could then be passed on to the shareholders. We agree with respondent's last contention and, accordingly, we will not discuss respondent's other arguments with respect to the investment tax credit.

Section 38 provides that a credit against income tax is allowed to a taxpayer for qualified investment in certain property. The credit is available only for property with respect to which depreciation is allowable and which has a useful life of 3 years or more. Sec. 48(a)(1). Depreciation is allowable only for property used in the trade or business or held for the production of income. Sec. 167(a). Therefore, the relevant inquiry is whether the automobiles purchased by Cerritos and Delta were used in the trade or business or held for the

production of income. If they were not so held, no depreciation or investment tax credit is allowed to Cerritos or Delta and thus there is no investment tax credit to pass through to the shareholders.[34] *Nicholls v. Commissioner*, 56 T.C. 1225, 1238 (1971); *Rodney v. Commissioner*, 53 T.C. 287 (1969).[35]

In determining whether a taxpayer is engaged in carrying on of a trade or business under section 162(a), the activity must "be entered into, in good faith, with the dominant hope and intent of realizing a profit, i.e., taxable income, therefrom." *Hirsch v. Commissioner*, 315 F.2d 731, 736 (9th Cir. 1963), affg. a Memorandum Opinion of this Court. See *Brannen v. Commissioner*, 78 T.C. 471 (1982); *Hager v. Commissioner*, 76 T.C. 759, 784 (1981). This rule applies even in the case of a small business corporation. *Eppler v. Commissioner*, 58 T.C. 691 (1972).

In the instant case, there is no question that Cerritos and Delta did not enter into the activity of car leasing with the dominant hope and intent of realizing a profit. In fact, it was contemplated when both leasing companies entered into the leasing business that they would sustain net operating losses that could be passed through to their shareholders. In the brochure describing the auto-leasing plan, it was stated that the leasing companies "intend to generate losses." Furthermore, the lease rentals were set well below a fair rental rate, thus insuring that the leasing companies would suffer a loss. A part of the money which should have been paid to the leasing companies as rent was instead diverted to Confidential as a purported interest payment. As if this were not enough, the leasing companies then purportedly reimbursed the participants for all their expenses in operating the automobiles, including gasoline, although the car leases themselves did not require this. In some cases, such as Pike's, the reimbursed expenses exceeded the total lease payments made by the lessors.

The payments received from the participants by the leasing companies for stock, instead of being used to buy the cars, were

---

[34]Assuming Cerritos and Delta qualified for the investment tax credit, it would be apportioned pro rata among the persons who are shareholders of the corporations on the last day of the taxable year. See sec. 48(c)(1).

[35]See also *C. M. Worley v. Commissioner*, T.C. Memo. 1980–51.

turned over to Confidential in exchange for deferred-payment thrift certificates, thus requiring the leasing companies to meet the monthly payments on the financing arrangements made to purchase the cars out of current income. The residual value of the cars that were turned in after 2 years could hardly be expected to close the gap between income and expenses—and these cars would probably be traded in for new cars anyway. Furthermore, the promotional literature distributed by Kersting suggested that the principal purpose of the leasing companies would be to take advantage of tax deductions not available to the individual participants which could be passed through to their shareholders and that as a result "the typical Leasing Company will engender net operating losses for tax purposes."

Similarly, it cannot be said that the automobiles were held for the production of income. As indicated above, Cerritos and Delta both entered into the leases knowing beforehand that they would lose money on the leases. Accordingly, we hold that since the automobiles were not used in a trade or business or held for the production of income, Cerritos and Delta were not entitled to depreciation on the automobiles and therefore they were not entitled to investment tax credits which could be passed through to Pike and Mukai.

## II. Acceptance Corporation Plan

### A. background information

The second tax shelter involved herein is the "Acceptance Corporation Plan." Sometime in 1975, the IRS audited six of Kersting's leasing companies. Kersting wrote to the various shareholders of the leasing companies and proposed that they consider investing in an alternative tax shelter that would create the same amount of deductions for the shareholders as they had received in the auto-leasing plan. The stated purpose for this proposal was that if the IRS denied the tax deductions generated by the participants' involvement in the auto-leasing plan, they would still have the deductions generated by this new plan to fall back on.

In a letter dated November 5, 1975, sent by Kersting to the various shareholders of the auto-leasing plan, the mechanics of the acceptance corporation plan were explained. Kersting was

to organize an acceptance corporation for the purpose of engaging in lease financing. Anyone wishing to participate was invited to acquire equity in the company in 10,000-share increments, with the stock selling at $1 per share. One of Kersting's finance companies would advance the funds to the shareholders for the stock purchase at 18-percent interest per annum. For every $10,000 borrowed, interest charges would equal $1,800, which, according to the letter, would be deductible under section 163. The advance was to be a nonrecourse loan limiting the participants' liability to the stock to be acquired in the acceptance corporation. The only collateral required from the participant was the stock he was purchasing in the acceptance corporation.

The acceptance corporation would then allow the participant to subscribe for additional stock by executing a stock subscription agreement. Interest was charged to the participants on the unpaid portion of the subscription agreement at the rate of 12 percent per annum, which according to the letter, would yield a deduction of $1,200 per year for every $10,000 worth of stock to which the participant subscribed. If the participant desired, the funds necessary to prepay the interest due on the stock purchase loan and the stock subscription agreement would be lent to the participant by the finance company by means of a leverage loan at 6-percent interest so that he could prepay such amounts and secure the entire deduction in 1975. The money each participant paid as interest on the stock purchase loan and the stock subscription agreement would be paid back to each participant by the acceptance corporation's declaring a dividend out of capital (which would be nontaxable) equal to such amount. Thus, each participant was assured that the only out-of-pocket expenditure he would have to make would be the interest on the leverage loan. In the following years, the interest paid by the participant on the stock purchase loan and the stock subscription agreement would continue to be reimbursed to them by virtue of the acceptance corporation's paying a nontaxable dividend equal to such amount.

The letter went on to assure the participants that they would have no personal liability on the borrowing engaged in. Since the participants had established credit with Kersting's

finance companies, the finance companies had no hesitation in extending credit of up to $30,000 to each participant.

The stock purchase loan made to each participant could be paid off or canceled by the participant's turning in his stock certificate for cancellation.

### B. PARTICIPANT'S INVOLVEMENT
### IN ACCEPTANCE CORPORATION PLAN

In late 1975, Pike and Mukai both decided to participate in the acceptance corporation plan. Pike purchased 30,000 shares at $1 per share and subscribed to purchase 30,000 more shares in the Norwick Acceptance Corp., hereinafter Norwick.[36] Mukai purchased 20,000 shares and subscribed to an additional 20,000 shares of Norwick. Pike and Mukai purportedly borrowed $30,000 and $20,000 from the Windsor Acceptance Corp., hereinafter Windsor,[37] at 18-percent interest per annum, to purchase the Norwick stock.[38] The loan proceeds were made payable jointly to Pike and Norwick, and to Mukai and Norwick. Both Pike and Mukai were instructed to endorse the checks and send them to Norwick, which they did. In return, Pike and Mukai received their certificates for the Norwick stock.[39]

The stock subscription agreements entered into by Pike and Mukai required them to pay Norwick 12-percent interest per annum on the unpaid purchase price. In December 1975, Pike and Mukai each wrote checks of $3,600 to Norwick to prepay the interest on the stock subscription agreements and checks to Windsor for $5,400 to prepay the interest on the stock purchase loan.[40]

---

[36]Norwick was not recorded by any State as a corporation until June 30, 1979, when Mendocino Corp., a Nevada corporation, changed its name to Norwick Acceptance Corp. Norwick had three directors. Kersting was president and director of Norwick, his wife, Ute Kersting, was a second director, and Sherill Pang, an administrative assistant of Kersting's, was the third director of Norwick.

[37]Kersting was president and director of Windsor.

[38]On Feb. 10, 1976, Pike received assurances from Kersting that there would be no personal liability with respect to his stock-purchase loan and that his liability would be limited to his 30,000 shares of Norwick stock.

[39]Although the proceeds of these loans were purportedly received in 1975, Kersting did not actually mail the checks to Pike and Mukai until Mar. 31, 1977.

[40]Mukai paid the same amount of interest on the stock purchase loan and the stock subscription agreement as Pike did, even though Mukai had borrowed less money and had

On December 29, 1975, the checks written by Pike were redeposited by Kersting back into Pike's bank account. On January 16, 1976, Kersting redeposited the checks written by Mukai, back into Mukai's bank account. As a result, although it appeared that Pike and Mukai had paid interest to Norwick and Windsor, in fact, Pike and Mukai were out no money, and neither Norwick nor Windsor had received any funds.[41]

On or about January 1976, Windsor executed a leverage loan with both Pike and Mukai for $9,000 with interest at 6 percent per annum.[42] The proceeds were apparently loaned to Pike and Mukai to enable them to prepay the interest for 1975 on the stock purchase loans and on the stock subscription agreements, even though Pike and Mukai had already purportedly paid the interest in 1975.[43]

On June 25, 1976, Kersting sent Pike and Mukai each a check for $9,000, which purportedly represented a return of capital dividend from Norwick. The checks were sent to Pike and Mukai, unsigned, with instructions for them to endorse the checks and return them to Norwick.[44] Each of the checks bore the notation "pay off loan," which referred to the $9,000 Pike and Mukai each owed Windsor on the leverage loans. By endorsing and returning the checks to Norwick, Pike and

---

agreed to subscribe to fewer shares of stock than Pike had.

The interest on the stock purchase loan was calculated by multiplying $30,000 × 18-percent interest which equals $5,400. For Mukai, it should have actually been $20,000 × 18-percent interest which equals $3,600. Thus Mukai should have paid $1,800 less than he did in interest to Windsor. The interest due on the stock subscription agreement was calculated for both Pike and Mukai by multiplying $30,000 (the unpaid purchase price of the stock to which the parties had agreed to subscribe times 12-percent interest which equals $3,600. For Mukai, it should have actually been $20,000 × 12-percent interest which equals $2,400. Thus, Mukai was overcharged $1,200 in interest by Norwick. Mukai was unaware of the fact that Windsor and Norwick had overcharged him $1,800 and $1,200, respectively. These overpayments were credited by Norwick and Windsor against the interest Mukai owed the following year.

[41] At the time Pike wrote these checks totaling $9,000, he had only $1,000 in his checking account. The record does not reveal the amount of money Mukai had in his checking account at the time he wrote his checks.

[42] On Aug. 9, 1976, pursuant to an agreement between Pike and Kersting, the interest on his $9,000 note was reduced to 1 percent, or $90 per year.

[43] In 1976, Pike and Mukai paid the interest due on their $9,000 notes. Pike paid $90 ($9,000 x 1% interest) and Mukai paid $540 ($900 x 6% interest). These amounts were the only actual out-of-pocket moneys that were expended by Pike and Mukai with respect to the acceptance corporation tax shelter.

[44] Although Mukai owned only 20,000 shares of Norwick compared to Pike's 30,000 shares, they each received the same amount of a dividend from Norwick.

Mukai were relieved of the $9,000 liability on the leverage loans.

Kersting, after receiving the dividend checks back from Pike and Mukai and all the other various shareholders, endorsed them over to Windsor, and on December 10, 1976, deposited them into Windsor's account. Windsor, on the same day, wrote a check to Norwick to cover all the dividend checks it had written.

Prior to August 10, 1977, the due date of Pike's stock purchase loan, Pike decided to get out of the acceptance corporation plan. At that time, Pike purportedly owed Windsor $34,950 on the stock purchase note.[45] Norwick bought Pike's stock for $35,625, that is, at $1³/₁₆ per share, which is the closet price in an even 1¹/₁₆-dollar figure to the amount Pike owed on the stock purchase note.[46] Pike then used these proceeds to pay off the $34,950 due on the stock purchase loan to Windsor.[47]

On or about the date Mukai's stock purchase note of $20,000 was due, Kersting mailed to Mukai a note issued by Mahalo Acceptance Co., hereinafter Mahalo, another Kersting entity,[48] along with a check issued jointly to Mukai and Windsor. Mukai was instructed to sign the new note, endorse the check, and mail them back to Windsor. In this manner, Mukai's stock purchase note to Windsor was retired.[49] Other than this renewal of the stock purchase note, Mukai has made no principal payment on the $20,000 loan.[50] In addition, other than the interest he prepaid on the stock purchase loan for the period of August 10, 1975, to August 10, 1976, no interest

---

[45]$30,000 plus interest from August to July 1977 in the amount of $4,950.

[46]At $1⅛ per share, Pike would have received $33,750, which is $1,200 less than he "owed." At $1³/₁₆ per share, he "received" $675 more than he "owed."

[47]The transaction was handled in the following manner: On July 27, 1977, Pike wrote a check to Windsor for $34,950 in payment of his stock purchase loan, which was deposited in Windsor's account. Windsor then wrote a check to Federated Finance Co. (formerly known as Confidential) for $35,000, which was deposited into Norwick's account. Norwick then wrote a check to Pike for $35,625 to purportedly purchase back his Norwick stock.

[48]Kersting was president and director of Mahalo.

[49]Mahalo's bank account on which the check was written was not opened until Feb. 19, 1978; even though the check is dated Aug. 10, 1977, the check did not clear the bank until May 26, 1978.

[50]This, despite the fact that the loan had a purported due date of Aug. 10, 1980.

payments have been made on the stock purchase loan from Windsor or on the loan renewal with Mahalo.

The subscription agreements entered into by both Pike and Mukai did not state a date for performance, and no stock was ever purchased by Pike or Mukai pursuant to the stock agreements.

At no time were the shareholders of Norwick given a financial statement of its condition, and Mukai never made requests for information regarding Norwick's operation. No income tax returns have been filed by Norwick for 1975 or 1976. Norwick was not recorded by any State as a corporation until June 30, 1979, when Mendocino Financial Corp., a Nevada corporation, changed its name to Norwick Acceptance Corp.

On their 1975 income tax returns, Pike deducted as interest the $5,400 paid to Windsor on the stock purchase loan and the $3,600 paid to Norwick on the subscription agreement. Mukai deducted as interest the $3,600 paid to Norwick on the subscription agreement. Respondent disallowed these deductions in their entirety.[51]

### C. OPINION

Pike and Mukai assert that they are entitled to deduct such amounts under section 163(a).[52] Respondent asserts first that they are not entitled to deduct such amounts because there was no payment of interest made by Pike or Mukai; second, that the indebtedness between Pike and Mukai and Windsor

---

[51]Although Mukai understood that the $5,400 paid to Windsor was for interest on the stock purchase loan, Mukai testified that he could not recall why he did not deduct the $5,400 on his 1975 return.

Apparently no interest was paid in 1975 by either Pike or Mukai on the $9,000 leverage loans.

[52]Petitioners also assert that "by failing to include in his QUESTIONS PRESENTED, and by merely brushing by reference in his POINTS RELIED UPON the transaction between Pike and Mukai and Norwick Acceptance Corp., the respondent has waived his disallowances covering those transactions." First of all, we note that these issues were dealt with extensively by respondent in his opening brief. Furthermore, petitioners, themselves, state that "at the trial a very substantial amount of testimony was adduced into evidence which pertains to Norwick Acceptance Corp., a company in which both Pike and Mukai purchased and subscribed to stock." Thus, petitioners have not been unfairly surprised, and the claim that respondent has waived his disallowances regarding petitioners' transactions with Norwick Acceptance Corp. is totally without merit. *Nat Harrison Associates, Inc. v. Commissioner*, 42 T.C. 601, 617 (1964).

or Norwick was a sham; and third, that the interest payments were really a fee charged to Pike and Mukai to participate in the tax shelter. Finally, respondent asserts that the stock subscription agreements, if not a sham, still did not create an indebtedness since subscription agreements do not form a debtor-creditor relationship. We agree with respondent that there was no "payment" of interest by petitioners in 1975. Accordingly, it is unnecessary to consider respondent's alternative contentions.

Section 163(a) allows a deduction for all interest paid or accrued within the taxable year on indebtedness. Since petitioners are cash basis taxpayers, they are entitled to deductions only for the interest *paid* during the taxable years. Sec. 1.461–1(a)(1), Income Tax Regs.[53] An examination of the facts clearly shows that Pike and Mukai did not pay any interest to Norwick or Windsor in 1975. The checks petitioners wrote to pay off the interest were redeposited directly into the bank accounts on which the checks were written. Thus, the checks were deposited to cover themselves. As a result, no funds were ever received by Norwick or Windsor from petitioners, and no funds were ever paid by petitioners. In fact, at the time Pike wrote his interest checks to Norwick and Windsor totaling $9,000, he only had $1,000 in his checking account. It is thus clear that Pike knew the checks would never be charged against his account, since they would not have cleared due to insufficient funds. It is also interesting to note that Mukai, who owed only $6,000 in interest, "paid" a total of $9,000. Had Mukai really been paying the interest, he undoubtedly would have realized that he was paying more interest to Norwick and Windsor than he actually owed. Based on the above, we hold that no payment of interest was made by petitioners in 1975 on the stock purchase loans and the

---

[53]Sec. 1.461–1. General rule for taxable year of deduction.

(a) *General rule* —(1) *Taxpayer using cash receipts and disbursements method.* Under the cash receipts and disbursements method of accounting, amounts representing allowable deductions shall, as a general rule, be taken into account for the taxable year in which paid. * * *

subscription agreements and that they are not entitled to an interest deduction under section 163(a) for such amounts.[54]

*Decisions will be entered under Rule 155.*

---

[54]We are somewhat mystified why the payments to Norwick under the stock subscription agreements were classified as "interest" in any event. The agreements simply stated that the participants agreed to buy X number of shares from Y company for $1 per share. No date for performance was specified. Interest on the unpaid balance of the agreement was to be 1 percent per month. It is stipulated that the agreements were never called by Norwick, and petitioners did not buy any stock under the agreements. Hence, they presumably owed nothing under the agreement for which "interest" would accrue. At best, the amounts paid would be some sort of a fee for an option to purchase.