WILLIAM G. JAMESON and BETTY S. JAMESON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Jameson v. Commissioner
Docket No. 21389-81.
United States Tax Court
T.C. Memo 1985-262; 1985 Tax Ct. Memo LEXIS 366; 50 T.C.M. (CCH) 6; T.C.M. (RIA) 85262; June 3, 1985. William G. Jameson and Betty S. Jameson, pro sese. Juandell D. Glass, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in petitioners' Federal income tax as follows: Year
Deficiency
1974
$12,532
1976
43,522
1977
26,022
1978
10,477
After concessions by the parties, the issues for decision are: (1) whether petitioners are entitled to various *369 deductions and credits claimed in connection with their purchase of various television films; (2) whether petitioners have an allowable net operating loss carryback from the taxable year 1979 in excess of the amount determined by the Commissioner; and (3) whether the Commissioner should be allowed to amend his answer after trial and submission of the parties' initial briefs to assert the applicability of section 6621(d) [1] which imposes a higher rate of interest on substantial underpayment attributable to certain tax motivated transactions. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and accompanying exhibits are so found and incorporated herein by reference. Petitioners, husband and wife during the taxable years in issue, were divorced in 1980. At the time their petition was filed, petitioner William Jameson (hereinafter referred to as "Mr. Jameson") resided in Tulsa, Oklahoma, and petitioner Betty Jameson (hereinafter referred to as *370 "Mrs. Jameson") resided in Huntsville, Alabama. During the taxable years in issue, Mr. Jameson worked as an executive for Fabric World, Inc. and Fabric World Wholesale, Inc. of Huntsville, Alabama. Mrs. Jameson worked as a buyer for Fabric World, Inc. and as a secretary for the First Alabama Bank of Huntsville. In November and December of 1976, Mr. Jameson received certain written materials from Sheltered Management Corp. of Great Neck, New York, concerning the purchase of television programs for distribution to television stations in the United States. Sheltered Management Corp. acted as the promoter of the television program sales activities. The written materials received by Mr. Jameson included a five-page discussion of the attendant risk factors. Mr. Jameson also received documents entitled "Distribution of Television Programming" and "Tax Shelter Summary" which read as follows: DISTRIBUTION OF TELEVISION PROGRAMMING
1. The Television Market comprise [sic] of over 1,100 TV and UF stations in the U.S.
2. Advertising Agencies have clients who seek to advertise their products on TV. They purchase TV time known in the industry as "spots". Each spot is 30 seconds. *371 3. The Distributor has a following among many ad agencies who advise him on what stations their clients wish to sell their products. 4. The Distributor and his staff visits [sic] these stations, offers [sic] the "package" without any cash outlay in exchange for spots. They are then sold to the Ad Agency at a discount rate from the prices listed in Standard Rate and Data. PROJECTED INCOME IN THE FIRST 24 MONTHS OF DISTRIBUTION FOR THE FIRST RUN
PRIMARY MARKET:
CASH
50%
25%
25%
SPOTS
REALIZED
DISTRIBUTOR
INVESTOR
AMORTIZE DEBT
10 $5,000
$2,500
$1,250
$1,250
100
50,000
25,000
12,500
12,500
350
175,000
87,500
45,900
* 41,600
SECONDARY MARKET:
CASH
50%
25%
25%
SPOTS
REALIZED
DISTRIBUTOR
INVESTOR
SELLER
500  $15,000
$7,500
$3,750
$3,750
1,000
30,000
15,000
7,500
7,500
2,500
75,000
37,500
18,750
18,750
6,000
180,000
90,000
48,400
* 41,600
*372 TAX SHELTER SUMMARY
I. SELLER TO INVESTOR, AN INDIVIDUAL AGREEMENT (NO PARTNERS):
A. TV Program is purchased in perpetuity for distribution for television in the United States. B. Down payment of 20% the balance of 80% is due in 10 years. Payment on the balance to come from the income of film distribution receipts. No Note is executed. II. DISTRIBUTION AGREEMENT:
A. Agreement with a TV distribution company for a period of 10 years. B. 50% of gross receipts is to be retained by the Distribution Company. The Investor receives 25% of gross receipts for himself and the remaining 25% is remitted to the Seller to be applied to reduce the debt. III. LOAN AGREEMENT:
A. Written Agreement by a Lender who will lend the Investor an amount of money to pay the Seller the balance due at the end of the 10 year period; interest at 6%. B. If the Investor borrows any money from the Lender he will (in the 11th year) sign a promissory note - non-negotiable for the amount of the loan, due in one year; interest 6%. 1. At the end of the year at the Investors option he can renew the note for another year until the note is paid off, from income received from *373 TV Distribution. 2. The Investor shall pay $200 a year for 10 years in consideration for the loan commitment. IV. TAX CONSEQUENCES:
A. The only program today that still offers a 5:1 leverage. B. Depreciation or tax write-off is 60% the first year; 10% the second year; balance spread over remaining 8 years. C. Investment Tax Credit of full 10% is available on total cost of TV Program (Section 801 and 804). D. The Program is in strict compliance with the Tax Reform Act of 1976 and the "at risk" rule. (Section 465). TAX SHELTER SAVINGS
SCHEDULE "Y" - TAXABLE INCOME
Original Taxable Income
$52,000 $76,00
$100,000
$120,000
60% Depreciation 1st Year
-31,200 -45,600
- 60,000
- 72,000
Adjusted Taxable Income
20,800 30,400
40,000
48,000
The Tax Is:
4,636 8,036
12,140
16,060
Deduct Investment Tax Credit 10%
- 5,200 - 7,600
- 10,000
- 12,000
Tax to Pay
(564)
436
2,140
4,060
Tax Due Before Shelter
18,060 31,020
45,180
57,580
Dollar Savings
18,624 30,584
43,040
53,520
Investment In Shelter
-10,400 -15,200
- 20,000
- 24,000
NET NET SAVINGS
$ 8,224 $15,384
$ 23,040
$ 29,520
Plus State Income Tax Savings
Your Accountant Will Compute This Item
*374 In December 1976, Mr. Jameson Issued a check to Sheltered Management Corp. for $20,800 toward the purchase of television programs entitled "Actor's Hour, Part "I and "Actor's Hour, Part II." Each television program cost a total of $52,000. The $20,800 payment constituted a downpayment of $10,400 toward the purchase of each television program. The remaining balance was to be paid over a perido of years. The exact terms of Mr. Jameson's purchase are vague as he failed to obtain executed copies of the purchase agreement and ancillary agreements concerning their distribution. Further, the unexecuted copies of the purchase agreement and ancillary distribution agreements retained by Mr. Jameson are also incomplete as to the identity of the parties with whom Mr. Jameson was dealing. According to the unexecuted copies of these agreements, the seller of the television programs was an organization whose partial name [2] was Industries, Ltd. Further, the unexecuted materials also do not indicate who was to act as distribution agent for petitioners' television programs or who was to act as the lender with respect to the unpaid balances of the purchase price. *375 In a letter dated October 15, 1977, World Wide Trade Exchange of St. Petersburg, Florida, which apparently was acting as the distribution agent for the television programs entitled "Actor's Hour, Part I" and "Actor's Hour, Part II," [3] informed Fabric World, [4] the licensor[5] of such programs, that it had received $205.86 of license fees on its behalf with respect to such television programs to date. On December 1, 1977, Mr. Jameson paid Newport Industries, Ltd., of Carson City, Nevada, $20,000 as a downpayment toward the purchase of a television program entitled "The Hitch Hiker." A balance due of $80,000 was to be paid over a period of years. The exact terms of Mr. Jameson's purchase are vague, however, as he again failed to obtain executed copies of the purchase agreement and *376 ancillary agreements concerning the distribution of such television program. In this instance, however, the unexecuted copies of the purchase and ancillary distribution agreements at least clearly identify Newport Industries, Ltd., of Carson City, Nevada, as the seller, Mr. Jameson as the purchaser and World Wide Trade Exchange of St. Petersburg, Florida, as the distribution company. Subsequent to the purchase of the aforementioned television programs, Mr. Jameson contacted World Wide Trade Exchange, the distributor of such programs, to express his concern about the lack of receipt of additional license fees with respect to the distribution of such films. Although Mr. Jameson never received any license fees beyond the October 1977 payment of $205.86, Mr. Jameson did not take any further action of change distribution agents. Despite respondent's repeated requests for copies of the television programs in issue, petitioners did not make the films available to respondent, even at trial. On their joint Federal income tax return for the taxable year 1976, petitioners claimed $62,400 of depreciation deductions with respect to their television program distribution activities. The claimed *377 deductions were computed utilizing the "sliding scale" method of depreciation. Petitioners also claimed $10,400 of investment tax credit with respect to their purchase of television films. Petitioners did not report the receipt of any income concerning their television program distribution activities for the taxable year 1976. On their joint Federal income tax return for the taxable year 1977, petitioners reported gross receipts of $207 and claimed $70,400 of depreciation deductions concerning their television program distribution activities. The claimed deductions were computed utilizing the "sliding scale" method of depreciation. Petitioners also claimed $12,929 of investment tax credit with respect to their purchase of television films and sought to carry back $12,532 of unused investment tax credit to the taxable year 1974. On their joint Federal income tax return for the taxable year 1978, petitioners claimed $15,200 of depreciation deductions concerning their television program distribution activities. The claimed deductions were computed utilizing the "sliding scale" method of depreciation. Petitioners did not report the receipt of any income concerning their television *378 program distribution activities for the taxable year 1978. On their joint Federal income tax return for the taxable year 1979, petitioners claimed $10,200 of depreciation deductions concerning their television program distribution activities. The claimed deductions were computed utilizing the "sliding scale" method of depreciation. Petitioners did not report the receipt of any income concerning their television program distribution activities for the taxable year 1979. In August 1981, petitioners filed amended joint Federal income tax returns for the taxable years 1978 and 1979. On their amended joint Federal income tax return for the taxable year 1979, petitioners claimed an increased net loss as the result of changing the treatment of the loss on Fabric World Wholesale common stock. On the original return, the loss of $71,298 was treated as a long-term capital loss. On the amended return for the taxable year 1979, petitioners now claimed that the loss was ordinary as the stock was "section 1244 stock" and that they satisfied all of the section 1244 requirements. On their amended return for the taxable year 1978, petitioners carried back part of the unused loss resulting *379 from their amended joint Federal income tax return for the taxable year 1979. In the notice of deficiency mailed to petitioners, the Commissioner disallowed all of the depreciation deductions claimed by petitioners for the taxable years 1976, 1977 and 1978 with respect to their television program distribution activities because it was not established that such expenses were incurred in a trade or business or with respect to property held for the production of income. The Commissioner also disallowed the claimed depreciation deductions on the ground that the nonrecourse indebtedness concerning the purchase of such television programs lacks economic substance and does not represent a bona fide debt obligation. In the alternative, the Commissioner determined that the allowable depreciation deductions with respect to such television program distribution activities are limited to the income forecast method of computing depreciation. With respect to petitioners' claimed investment tax credit, the Commissioner disallowed $10,400 and $9,999 of investment tax credit for the taxable years 1976 and 1977 concerning the purchase of the television programs because it was not established that *380 these films qualified for investment tax credit. Further, the Commissioner disallowed the $12,532 of claimed investment tax credit carryback from 1977 to 1974 because there was no unused investment tax credit in 1977. On February 6, 1985, the parties filed their opening post-trial briefs with the Court. On March 4, 1985, which was prior to the parties' filing deadline for their reply briefs, the Commissioner moved for leave to amend his answer to assert the applicability of section 6621(d) which imposes a higher rate of interest on substantial underpayments attributable to certain tax motivated transactions. Petitioners timely objected to the Commissioner's motion for leave to amend his answer. OPINION The first issue for decision is whether petitioners are entitled to various deductions and credits claimed in connection with their purchase of several television films. In the statutory notice mailed to petitioners, the Commissioner determined, inter alia, that the depreciation deductions claimed by petitioners with respect to their television program distribution activities were not allowable because it was not established that such expenses were incurred in a trade or business *381 or with respect to property held for the production of income. The Commissioner also disallowed investment tax credits claimed by petitioners jwith respect to their purchase of such television programs because it was not established that such property qualified for investment tax credit. The Commissioner's determination is presumptively correct, Welch v. Helvering,290 U.S. 111, 115 (1933), and petitioners bear the burden of proving it to be erroneous. Rule 142(a). Section 183(a) provides that, except as otherwise permitted in that section, individual taxpayers will not be allowed deductions which are attributable to activities that are "not engaged in for profit." Section 183(c) defines an activity not engaged in for profit as follows: (c) ACTIVITY NOT ENGAGED IN FOR PROFIT DEFINED.--For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212. Petitioners' entitlement to their claimed depreciation deductions turns on, among other considerations, whether the movie properties were *382 "used" in a "trade or business" or "held for the production of income" within the meaning of section 167(a). [6] Under section 48(a)(1), [7] the investment tax credit claimed by petitioners is allowable only for "property with respect to which depreciation (or amortization in lieu of depreciation) is allowable." Thus, petitioners' right to their claimed depreciation deductions as well as the investment tax credit depends upon their successfully showing that the activities from which they arose constituted a "trade or business" or were the result of activities for the production or collection of income or for the management, conservation or maintenance of property held for the production of income. See Flowers v. Commissioner,80 T.C. 914, 931 (1983); Pike v. Commissioner,78 T.C. 822, 841-842 (1982), affd. without published opinion 732 F.2d 164 (9th Cir. 1984). *383 The standard for determining whether an individual is carrying on a trade or business so that his expenses are deductible under section 162, or whether an individual is engaged in activities for the production or collection of income or for the management, conservation or maintenance or property held for the production of income so that his expenses are deductible under section 212, is: did the individual engage in the activity "with the actual and honest objective of making a profit"? Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Although a taxpayer's expectation of profit need not be reasonable, the facts and circumstances must indicate that the taxpayer had the requisite profit objective. Dreicer v. Commissioner,supra at 645. The requisite good-faith objective of making a profit, albeit an unreasonable expectation, is exemplified in section 1.183-2(a), Income Tax Regs., as follows: Although a reasonable expectation of profit is not required, the facts and circumstances must indicate that the taxpayer entered into the activity, or continued the activity, with the objective *384 of making a profit. In determining whether such an objective exists, it may be sufficient that there is a small chance of making a large profit. Thus it may be found that an investor in a wildcat oil well who incurs very substantial expenditures is in the venture for profit even though the expectation of a profit might be considered unreasonable. In determining whether an activity is engaged in for profit, a greater weight is given to objective facts than to the taxpayer's mere statement of his intent. The question of whether petitioners' television program distribution activities fall within the purview of section 183(a) is one of fact which must be resolved on the basis of all of the facts and circumstances and not just one factor. Engdahl v. Commissioner,72 T.C. 659, 666 (1979); Allen v. Commissioner,72 T.C. 28, 34 (1979). Petitioners have the burden of proving that they had the requisite profit objective. Allen v. Commissioner,supra at 34; Benz v. Commissioner,63 T.C. 375, 382 (1974); Rule 142(a). Section 1.183-2(b), Income Tax Regs., lists some of the relevant factors, derived principally from *385 case law, which "should normally be taken into account" in determining whether an activity is engaged in for profit. Benz v. Commissioner,supra at 383. The factors include: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. When petitioners' television program distribution activities are viewed in light of the aforementioned considerations concerning whether they, in fact, engaged in such activities with an "actual and honest objective of making a profit," it is quite apparent that the requisite profit-seeking impetus was absent. Rule 142(a). We initially observe that the manner in which petitioners carried *386 on these activities is quite revealing. Petitioners did not bother to obtain fully executed copies of the purchase and ancillary distribution agreements. [8] Further, although promotional materials received by Mr. Jameson prior to his December 1976 purchases projected substantial license fees during the first two years of ownership, petitioners still purchased another television program in December 1977 after receiving only $205.86 in license fees during the first year of ownership. Finally, despite petitioners' failure to receive any additional license fees from such films as the result of World Wide Trade Exchange's efforts on their behalf, Mr. Jameson did not take any action or change distribution agents. As to the expertise of petitioners or their advisors concerning such activities, petitioners offered no evidence concerning their prior involvement in similar activities. Although petitioners claimed to have contacted at least two attorneys to review such investments *387 prior to their purchase, petitioners' failure to present their testimony to corroborate such claims permits us to draw the inference that their testimony would not be supportive of petitioners' position. Wichita Terminal Elevator Co. v. Commissioner,162 F.2d 513, 515 (10th Cir. 1947). Additionally, petitioners offered no reliable evidence concerning the time and effort expended by them concerning their television program distribution activities. Further, no showing was made that they actually believed that the programs they purchased would appreciate in value. Petitioners also failed to present any evidence concerning their success in similar or dissimilar activities. The record also indicates a history of continuous and substantial losses resulting from petitioners' television program distribution activities. Aside from the receipt of a meager $205.86 of license fees during 1977, no additional license fees were produced by the films. Given the substantial costs of these television programs and petitioners' general level of inaction concerning this venture, such meager gross receipts are clearly indicative of a lack of the requisite profit-seeking objective. *388 This is further confirmed by the promotional materials billing the purchase of the programs as an attractive "tax shelter." Finally, we must comment on petitioners' conscious decision to deny respondent the opportunity to review the films in issue, even at trial. This fact, coupled with the incomplete purchase documents, strongly suggests that the films do not exist. Mr. Jameson's testimony concerning this matter was elusive and contradictory. Under these circumstances and after viewing his demeanor while testifying, we give little weight to his testimony. Mr. Jameson introduced a variety of exhibits to support his profit-seeking objective concerning his purchase of the programs in issue. Most of these exhibits were obtained by Mr. Jamesonsubsequent to his purchase of the television programs in issue and only after it became apparent that the Internal Revenue Service was challenging petitioners' claimed deductions and credits. Under such circumstances, the evidence is entitled to lettle, if any, weight with respect to petitioners' profit-seeking objective at the time of their purchase of the television films in issue. Estate of Baron v. Commissioner,83 T.C. 542 (1984). *389 Based upon the record, it is quite clear that petitioners have failed to carry their burden of proving that they had the requisite profit-seeking objective concerning their purchase of the television programs in issue. Rule 142(a). Accordingly, the Commissioner's disallowance of petitioners' claimed depreciation deductions and investment tax credit is sustained. The next issue for decision is whether petitioners have an allowable net operating loss carryback from the taxable year 1979 in excess of the amount determined by the Commissioner. The parties are in agreement concerning the amount of the net operating loss carryback from the taxable year 1979 resulting from the sale of the Fabric World Wholesale common stock except as to whether additional adjustments are necessary as the result of petitioners' television program distribution activities for the years in issue. Given our holding on the first issue for decision, no additional adjustments are necessary concerning the amount of net operating loss carryback from the taxable year 1979. Rule 142(a). The final issue for decision is the Commissioner's motion for leave to amend his answer to assert the applicability of section *390 6621(d) [9] which imposes a higher rate of interest on substantial underpayments attributable to certain tax motivated transactions. The Commissioner's motion was filed on March 4, 1985, which was after the filing date of the parties' opening post-trial briefs but before the filling date of the parties' reply briefs. Petitioners timely objected to the Commissioner's motion on general grounds. *391 The issue of whether the Commissioner should be allowed to amend his answer after trial and during the submission of the parties' post-trial briefs to assert the applicability of section 6621(d) was recently addressed by the Court in Law v. Commissioner, 84 T.C.     (filed May 23, 1985). The underlying substantive tax issues and procedural histories concerning the motions to amend in Law v. Commissioner,supra, and the immediate case are sufficiently alike so as to warrant a similar conclusion denying the Commissioner's motion for leave to amend. Further, when the Commissioner's motion and surrounding circumstances are viewed in light of Rule 41(a), it is apparent that this is not an "appropriate" case for the application of section 6621(d). Law v. Commissioner,supra (concurring opinion of J. Whitaker, slip opinion at p. 19). Accordingly, the Commissioner's motion for leave to amend his answer to assert the applicability of section 6621(d) is denied. Law v. Commissioner,supra.
Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years in issue and all rule references are to this Court's Rules of Practice and Procedure.↩
*. On a purchase of a TV program for $52,000 with a down payment of $10,400 and the balance of $41,600 due in ten years it is projected that this debt will be paid off on the first run within 24 months, and leave the investor with a profit of $45,900 from the primary market; without taking into consideration the income from the secondary market. These projections do not take into account, sales of more spots (the projection was made only to indicate the payment of the debt); sales of cablevision, and contract renewals or re-runs.↩
2. The adjective "partial" is utilized because the printing on such agreements contains blanks clearly indicating that "Industries, Ltd" (which is located in Carson City, Nevada) is not the complete name of the seller.↩
3. Although the letter does not specifically identify these television programs, we believe, based on the entire record, that they were the subject of the letter. ↩
4. The letter does not further identify "Fabric World" as to whether it was Fabric World, Inc. or Fabric World Wholesale, Inc. ↩
5. The letter indentifies Fabric World (and not Mr. Jameson) as the owner of the television programs.↩
6. SEC. 167. DEPRECIATION. (a) GENERAL RULE.--There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)-- (1) of property used in the trade or business, or (2) of property held for the production of income. ↩
7. SEC. 48. DEFINITIONS; SPECIAL RULES. (a) Section 38 Property.-- (1) In general.--Except as provided in this subsection, the term "section 38 property" means-- (A) tangible personal property * * * Such term includes only property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of 3 years or more. * * *↩
8. In Ziegler v. Commissioner,T.C. Memo. 1984-620↩, we held that a taxpayer's failure to possess a complete set of the controlling documents was indicative of a lack of businesslike conduct.
9. Sec. 6621(d) provides: (d) INTEREST ON SUBSTANTIAL UNDERPAYMENTS ATTRIBUTABLE TO TAX MOTIVATED TRANSACTIONS.-- (1) IN GENERAL.--In the case of interest payable under section 6601 with respect to any substantial underpayment attributable to tax motivated transactions, the annual rate of interest established under this section shall be 120 percent of the adjusted rate established under subsection (b). (2) SUBSTANTIAL UNDERPAYMENT ATTRIBUTABLE TO TAX MOTIVATED TRANSACTION.--For purposes of this subsection, the term "substantial underpayment attributable to tax motivated transactions" means any underpayment of taxes imposed by subtitle A for any taxable year which is attributable to 1 or more tax motivated transactions if the amount of the underpayment for such year so attributable exceeds $1,000. (3) TAX MOTIVATED TRANSACTIONS.-- (A) IN GENERAL.--For purposes of this subsection, the term "tax motivated transaction" means-- (i) any valuation overstatement (within the meaning of section 6659(c)), (ii) any loss disallowed by reason of section 465(a) and any credit disallowed under section 46(c)(8), (iii) any straddle (as defined in section 1992(c) without regard to subsections (d) and (e) of section 1092), and (iv) any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period. (B) REGULATORY AUTHORITY.--The Secretary may by regulations specify other types of transactions which will be treated as tax motivated for purposes of this subsection and may by regulations provide that specified transactions being treated as tax motivated will no longer be so treated. In prescribing regulations under the preceding sentence, the Secretary shall take into account-- (i) the ratio of tax benefits to cash invested, (ii) the methods of promotion the use of this type of transaction, and (iii) other relevant considerations. (C) EFFECTIVE DATE FOR REGULATIONS.--Any regulations prescribed under subparagraph (A)(iv) or (B) shall apply only to interest accruing after a date (specified in such regulations) which is after the date on which such regulations are prescribed. (4) JURISDICTION OF TAX COURT.--In the case of any proceeding in the Tax Court for a redetermination of a deficiency, the Tax Court shall also have jurisdiction to determine the portion (if any) of such deficiency which is a substantial underpayment attributable to tax motivated transactions.↩