EMANUEL S. LOMBARD AND KATHLEEN A. LOMBARD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lombard v. Commissioner
Docket No. 22578-90
United States Tax Court
T.C. Memo 1994-154; 1994 Tax Ct. Memo LEXIS 155; 67 T.C.M. (CCH) 2636; April 13, 1994, Filed *155 Emanuel S. Lombard, pro se. For respondent: John C. McDougal. KORNER
KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined deficiencies in and additions to petitioners' Federal income tax as follows: Additions to Tax
Year
Deficiency
Sec. 6653(a)(1) Sec. 6653(a)(2) Sec. 6661 1984
$  3,749.50
$ 178.48
[1]
--  1985
18,049.40
902.47
[1]
$ 4,152.35
After concessions before and during trial, [1] the issues for decision are: (1) Whether petitioners, Emanuel S. Lombard and Kathleen A. Lombard (hereinafter Mr. and Mrs. Lombard) are entitled to a 1985 bad debt deduction on the 1981 sale of their last Innes Place rental property due to the buyer's default on a note in the amount of $ 133,436; (2) whether petitioners were engaged in farming the Rosewood property for profit during 1984 and 1985 within the meaning of section 183; (3) whether for 1984 and 1985 the gross profit and gain calculation on petitioners' installment sale of the Oakhurst Circle apartment complex (hereinafter Oakhurst) should retroactively reflect a reduction in the sale proceeds petitioners received from *156 such sale in the amount of $ 10,000, as well as an additional commission expense in the amount of $ 5,300; (4) whether Mr. Lombard's 1984 claimed transportation expenses in the amount of $ 3,212 are deductible ordinary and necessary business expenses incurred while traveling between the Oakhurst properties located in Charlottesville, Virginia, and his farm properties; (5) whether petitioners' activity of renovating a property known as the Dixie is an activity engaged in for profit during 1984 and 1985 within the meaning of section 183; (6) whether the Dixie property qualifies for a rehabilitation credit in 1985 pursuant to section 46(a)(3); and (7) whether petitioners are liable for additions to tax, pursuant to section 6653(a)(1) and (2) due to petitioners' negligence or intentional disregard of rules and regulations for 1984 and 1985, as well as section 6661 additions to tax for a substantial underpayment, due to petitioners' failure to adequately disclose substantial authority for their tax positions on either their return or in a statement attached thereto for 1985. *157 All statutory references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted. FINDINGS OF FACT Petitioners resided in Williamsville, Virginia, on October 9, 1990, the date the petition in this case was filed. Mr. Lombard received a Ph.D. degree in 1968 and was employed as a tenured teacher until 1981 with the Beverly Hills School District in California. 1. Innes Place Rentals in Los Angeles, California
Mr. Lombard has rehabilitated old buildings. In 1974 and 1975, petitioners purchased three rental properties at 1307, 1314, and 1317 Innes Place in the Venice area of Los Angeles, California, for $ 49,874, $ 19,516, and $ 38,721, respectively. Mr. Lombard then spent $ 18,312 and many hours improving these properties until 1979, when he sold two of the properties, 1307 and 1317. On February 18, 1981, petitioners sold their remaining Venice rental, 1314 Innes. The actual contract of sale is not in evidence, but Mr. Lombard admitted that the total stated consideration from this sale was the same $ 265,000 figure as indicated in the December 11, 1980, escrow *158 instructions. These escrow instructions also indicated that petitioners agreed to finance $ 148,458 of the purchase price on the 1314 Innes property for buyer Marion E. Brown (hereinafter Brown or defendant) by agreeing to accept two notes from Brown at 12.5-percent interest with principal due in 5 years. It seems that petitioners unwittingly transferred title to Brown even though they remained unsecured by a mortgage or deed of trust. Within 6 to 8 weeks of the sale, Brown defaulted on his obligations to petitioners, and it was then that petitioners became aware they had no rights to foreclose against the 1314 Innes property. Petitioners immediately commenced suit, and on July 7, 1982, a judgment was entered by the Superior Court of the Central District of Los Angeles, California, against Brown. At the time the judgment was entered, Brown had 42 other judgments already recorded against him. Of the total judgment entered in favor of petitioners, $ 133,426 reflected the amount of principal payments Brown defaulted on for which he remained indebted to petitioners from the 1314 Innes sale. In reporting the 1314 Innes property sale, petitioners believed that as a result of Brown's *159 fraud and their corresponding loss, the proper sales price for this property should reflect only the amount of cash and other consideration petitioners actually received during the year of sale. Therefore, petitioners did not include the $ 133,426 as part of their reported selling price on the sale. Petitioners reported the 1314 Innes sale on Form 4797, Supplemental Schedule of Gains and Losses, at a total gain of $ 108,986. This gain reflected a total selling price net of selling expenses of only $ 126,824 and an adjusted basis of $ 17,838. Petitioners arrived at this $ 126,824 selling price figure by reducing their $ 265,000 total contract price by the loss to Brown in the amount of $ 133,426; the $ 4,750 difference is presumably due to selling costs. However, in reporting the sale, petitioners did not complete part IV of Form 4797, which would have indicated they were electing out of the installment method of reporting and were reporting a note at less than its full face value. In a letter dated January 8, 1987, petitioners' attorney indicated that Brown had been found bankrupt and petitioners' judgment against him was worthless. Petitioners claimed a $ 3,000 deduction on *160 their 1985 return related to the above judgment's worthlessness and described it only as "other loss". Respondent disallowed this $ 3,000 loss due to a lack of substantiation. 2. The Rosewood Farm
Mrs. Lombard thought she liked farming. Mr. Lombard sought not only to fulfill his wife's desire to farm but also to enable her to achieve economic independence so she would be able to support herself, as well as to support and care for him during his approaching retirement years. Mrs. Lombard was 30 years younger than Mr. Lombard. Mr. Lombard was willing to commute to work a maximum of 80 miles. Petitioners searched in California within this radius for an appropriate farm to produce organic beef cattle, but each proved unsatisfactory. Having no success within this area, Mr. Lombard told his wife that if she could locate an acceptable farm within 50 miles of a major university where he could work, he would be willing to quit his job and move. Mrs. Lombard searched for over a year until she found an acceptable farm near Steeles Tavern, Virginia, which was considered sufficiently close to the University of Virginia. In December 1978, petitioners purchased a 287-acre farm, *161 Rosewood. Petitioners' personal belongings were moved to Rosewood in 1979, and the Lombard family resided there throughout the years in question. Although petitioners produced no projections of income or loss, Mr. Lombard estimated that Rosewood would produce an annual income of $ 45,000 if it was operated free from debt. Mr. Lombard recognized the difficulty of generating profits by farming and the nearly impossible task of farming with the added burden of debt. Petitioners anticipated they would be able to pay off Rosewood's mortgage with their accumulated net worth and still retain an ample safety net to make needed repairs on their newly acquired properties. Mr. Lombard thought his plan was a cautious one, as he did not retire from his tenured position until he thought everything was in order in Virginia and sold in California. However, later events forced a change of plans. As a result, petitioners realized that the farm would carry a mortgage, and they revised their strategy of debt-free operation to the gradual retirement of indebtedness as they incrementally sold the Oakhurst apartment units (discussed hereinafter) at anticipated gains. Petitioners' difficulties began *162 with Brown's default on the 1314 Innes sale and the resulting losses. In 1980, petitioners began their family with the birth of their first child. Petitioners had two children by 1982, three by 1984, four by 1985, and as of March 9, 1993 (the date of this trial), petitioners had a family that included seven children. Petitioners' tax returns for the years 1979 through 1985 are in evidence. After 1980, Mr. Lombard reported retirement proceeds from the California State Teachers' Retirement System. Mr. Lombard also reported gross wages and miscellaneous nonemployee compensation which he received from his tenured teaching position with the Beverly Hills School District, as well as undefined work after 1981 for the Virginia Community College in Richmond, Virginia, and the Augusta County Schools in Fishersville, Virginia. He reported as follows: Total Gross Year
Beverly Hills Virginia
Pension Amount Reported 1979
$ 20,200
0  0  $ 20,200
1980
14,006
0  0  14,006
1981
6,021
0  $ 5,057
11,078
1982
9,900
$ 8,247
6,098
24,245
1983
5,650
6,459
6,220
18,329
1984
4,341
0  6,341
10,682
1985
1,712
23,332
6,462
31,506
Mrs. Lombard *163 earned no income from 1979 through 1985. From 1979 through 1981, Mr. Lombard traveled often between Virginia and California, finalizing arrangements to sell petitioners' California properties. At the same time, he also attempted to secure suitable employment in Virginia. His difficulty in obtaining comparable work (to what he had in California) caused Mr. Lombard to pursue income in ways that generally required him to be away from the farm. Mr. Lombard also spent his time during the years in issue as follows: Continuing improvements on the Oakhurst apartments and freeing rentable space by storing unneeded items at the Dixie (described hereinafter) during its renovation; performing repairs and upkeep on their properties, including bushhogging at Rosewood; and in rehabilitating the Dixie into a future retail outlet to market Rosewood's organic beef and produce. Petitioners' Oakhurst apartments in Charlottesville, Virginia, were located 52 miles from the farm. Mr. Lombard's extensive traveling caused him to be away from his wife and family for substantial periods of time, sometimes 6 months at a time, until at least 1981 when he retired from his tenured teaching position with the *164 Beverly Hills School District and began receiving his pension. Due to Mr. Lombard's frequent absences and the growth of the Lombard family, Mrs. Lombard found it increasingly difficult to care for their children, as well as Rosewood cattle. Petitioners began to recognize that Rosewood was not going to succeed unless Mrs. Lombard had assistance from her husband. In 1986, following the years before us, although Mr. Lombard had only recently secured regular work in Virginia, he agreed to quit in order to free his wife from the house, allowing her to get out to care for the cattle and earn a living from the farm. In the year of purchase, the farm's depreciable assets totaled $ 62,864. The amounts were allocated as follows: $ 51,593 -- buildings, $ 1,338 -- livestock, $ 2,200 -- truck, and $ 7,733 -- machinery and equipment. The buildings included an office, barn, granary, chicken house, and fencing. The machinery and equipment included a "gravely", seeder, tractor, mower, rake, wagon, cutter, and cart. In 1980, petitioners added a tractor shed to Rosewood's buildings, a John Deere tractor and mower to its equipment, and they increased their livestock by purchasing $ 460 worth *165 of sheep. In 1981, petitioners added another cart, rakes, more fencing, an electric fence, and a sheep dog to Rosewood's equipment. For additional transportation needs, petitioners also purchased a GMC pickup and an International truck. In 1982, petitioners added a Ford tractor to the machinery, and in 1983 they purchased $ 550 worth of undescribed livestock. No additions occurred in 1984, but a bull was purchased in 1986. Petitioners initially acquired 3 or 4 cows and 8 or 10 sheep in 1979. By 1984 and 1985, the farm livestock inventory included 9 cows and 20 sheep. Mrs. Lombard began to keep a set of books for Rosewood in 1980 or 1981, but discontinued the practice after completing only a few pages due to her discouragement at Rosewood's lack of income. According to Mr. Lombard, his wife was barely able to handle multiplication tables. As indicated below, gross income associated with Rosewood from 1979 through 1985 totaled $ 6,088. Rosewood also produced 500 to 700 bales of hay per year that was not sold but which Mr. Lombard cleared from the fields, put up, and stored twice, sometimes three times a year in anticipation of greater quantities of cattle. The record indicates *166 farm gross income as follows: Year
Cattle
Sheep Wool
Eggs
Sundry
Dividends Total 1979
$     0
$     0
$  0
$  0
$ 456
$   357
$   813
1980
0
0
0
0
473
212
685
1981
745
237
81
20
0 * 31
1,114
1982
170
949
11
5
0 *a 363
1,498
1983
200
0
0
18
0 * 299
517
1984
0
0
0
0
0 * 394
394
1985
415
0
0
0
0 * 652
1,067
Total
$ 1,530
$ 1,186
$ 92
$ 43
$ 929
$ 2,308
b$ 6,088
* Several patronage dividends and other farm-related dividends were
evidenced by Forms 1099 and were reported on petitioners' Schedule B.
These amounts are included as farm-related income in gross receipts
for purposes of consistency.
a This figure combines $ 37 which was recognized by the parties and
another $ 326 that was not included as part of the gross proceeds received.
b Contrary to the evidence, the parties stipulated to only $ 4,385 in
gross receipts, which was the income petitioners reported during this
time period on their Schedules F.
Petitioners claimed the following expenses and losses on the Rosewood farm from 1979 through 1985: Item
1979
1980
1981
1982
Expenses:
Labor
$    432
$  2,656
$  1,608
133
Repairs & maint.
1,212
1,727
449
334
Interest
7,954
6,316
13,040
7,662
Feed
521
98
248
328
Seeds & plants
424
82
--
12
Fertilizers
--
--
--
93
Supplies
2,557
4,213
1,478
21
Breeding fees
18
29
29
--
Vet fees & medicine
--
--
89
193
Gasoline, fuel,
& oil
--
--
2,215
1,890
Taxes
793
545
765
680
Insurance
509
540
750
697
Utilities
355
168
176
168
Land clearing exp.
--
--
216
--
Telephone
552
405
502
309
Professional fees
--
469
47
50
Sundry
--
--
630
389
Depreciation
8,319
8,958
11,614
23,934
Freight, trucking
--
--
--
--
Total expenses
($ 23,346)
($ 26,206)
($ 33,856)
($ 36,893)
Plus gross proceeds
813
685
1,114
1,498
Total losses
($ 22,533)
($ 25,521)
($ 32,742)
($ 35,395)
*167 Item
1983
1984
1985
Expenses:
Labor
$   2,530
$    574
--
Repairs & maint.
225
--
$  2,397
Interest
11,750
15,803
18,636
Feed
673
--
262
Seeds & plants
--
--
--
Fertilizers
--
--
--
Supplies
264
1,127
72
Breeding fees
--
--
--
Vet fees & medicine
50
--
--
Gasoline, fuel,
& oil
1,005
412
727
Taxes
650
859
97
Insurance
325
176
581
Utilities
342
162
79
Land clearing exp.
--
--
--
Telephone
--
--
--
Professional fees
30
--
--
Sundry
--
119
--
Depreciation
11,058
--
8,009
Freight, trucking
--
--
25
Total expenses
($ 28,902)
($ 19,232)
($ 30,885)
Plus gross proceeds
517
394
1,067
Total losses
($ 28,385)
($ 18,838)
($ 29,818)
Respondent allowed $ 838 in taxes to be deducted on petitioners' Schedule A in 1984. Except for verified interest deductions discussed in the Dixie section (discussed hereinafter), respondent disallowed the remainder of Rosewood's above listed expenses to the extent they exceeded Rosewood's reported Schedule F farm income of $ 0 in 1984 and $ 415 in 1985. 3. Oakhurst Apartments
On April 24, 1979, shortly after acquiring Rosewood, petitioners purchased the Oakhurst apartment *168 complex, consisting of 16 rental units, located directly across from the University of Virginia in Charlottesville. Mr. Lombard increased the value and rental receipts of this property by expanding its rentable space through the improvement of garages and cellars which subsequently became rentable, and with the addition of the seventeenth rentable apartment with the conversion of an attic. The Oakhurst's gross rentals increased from $ 39,697 to $ 64,270 between 1979 and 1984. Although the Oakhurst had been Mr. Lombard's lifeline to the university, this association did not appear to prosper. By 1984 petitioners needed funds for fixing Rosewood and the Dixie (discussed hereinafter); therefore, all units were sold on November 21, 1984. Petitioners purchased the Oakhurst for $ 307,000 and sold it for $ 488,000. Petitioners did not attach Form 6252, Computation of Installment Sale Income, with their original 1984 Form 1040, but calculated the gain in a note attached to this return as if the installment method applied and stated that they intended to file an amended return and include the missing Form 6252. Petitioners never filed an amended return. Petitioners' calculation of their *169 gain using the installment method was reported only on page 1, line 13, of their Form 1040, which indicated a Schedule D capital gain. Respondent does not challenge petitioners' installment election, only their calculation of the reportable gain. Respondent's calculation of the gross profit follows: Selling/contract price
$ 488,000 Adjusted basis
Selling costs [1]
$  14,466
Commissions
23,980
Cost
307,000
Improvements [2]
24,369
Less depreciation
(61,322)
Total adjusted basis
($ 308,493)
Gross profit
$ 179,507 *170 The contract of sale provided that realtor Christopher Collins (hereinafter realtor) was entitled to a commission on the Oakhurst sale in the amount of 6 percent of the stated $ 488,000 gross sales price, which was $ 29,280. The $ 5,300 difference between what the realtor was entitled to, per the contract, and what respondent allowed remains disputed. Petitioners' statement of costs indicated that this total $ 29,280 commission was reduced by the disputed $ 5,300 amount, and the explanation printed beside this reduction was "per agreement". Mr. Lombard stated that in lieu of $ 5,300 cash, he gave the realtor two 1968 convertible Cadillacs. Mr. Lombard testified he purchased one Cadillac 10 months earlier for $ 500, and the other 9 years earlier for $ 2,000; however, petitioners submitted no documentary evidence of such purchases, transfers, or the vehicles' value. The Oakhurst contract of sale provided that the $ 488,000 selling price would be paid to petitioners as follows: (1) $ 10,000 earnest deposit; (2) $ 236,000 cash at closing; and (3) a $ 242,000 in funds secured by a deed of trust on the property, providing for biannual interest payments at 12 percent. The first bond *171 required principal to be paid in one payment on May 1, 1985, in the amount of $ 147,000, and the second bond was also due in one lump sum, 10 years from closing on November 21, 1994, in the amount of $ 95,000. Needing funds for their farm, as well as the Dixie, petitioners attempted to borrow money against the $ 95,000 bond. Petitioners were turned down by several banks and were unable to borrow against the bond. On March 27, 1986, petitioners and the purchasers entered into a prepayment agreement regarding the $ 95,000 bond. The purchasers prepaid their $ 95,000 debt to petitioners for $ 85,000, and petitioners accepted such prepayment as payment in full satisfaction of the liability. Petitioners received proceeds from the Oakhurst sale in the amounts of $ 246,000 in 1984, $ 147,000 in 1985, and $ 85,000 in 1986. Petitioners argue that the $ 10,000 discount should retroactively reduce their gross selling price and gross profit percentage. 4. The Dixie
Rosewood was located 1-1/2 miles off the highway, and the Dixie ran along the highway approximately 200 feet from the intersection with Rosewood's road. The Dixie was purchased for $ 65,000 and included 10 or 11 very *172 run down structures, originally intended as a motel, of which only 2 or 3 were thought to be salvageable. Mr. Lombard stated that the Dixie was not intended to be a money maker initially. Petitioners purchased this nearby parcel of real estate in 1979 with the intent not only of providing a future retail outlet for Rosewood's organic produce, but also to provide an additional source of revenue, as small businesses took occupancy once renovations had been completed. During renovation, the Dixie was used principally as storage for items such as Mr. Lombard's books, academic papers, research, tools from some six to seven crafts, Oakhurst's excess furniture, equipment, and Oakhurst tenants' personal items. The Dixie had its first tenant in 1980 with the opening of three businesses, which included a sign shop, a glass shop, and a submarine shop. By 1984, two cottages and the major house were habitable. However, it was not until 1987 that petitioners' first major tenant, The Country Inn, opened for business. In 1985, petitioners claimed a $ 930 investment credit (15 percent of $ 6,200) relating to their rehabilitation efforts on the Dixie. The $ 6,200 represented gas line, roof, *173 foundation, heat, and glass repairs. Respondent disallowed the credit on the grounds that petitioners had not established that the Dixie property properly qualified under section 48(a)(3). Gross income reported by petitioners for the Dixie from 1982 through 1985 was $ 500, $ 831, $ 420, and $ 450, respectively. Of the $ 450 received in 1985, $ 50 was for picture framing work performed by Mr. Lombard. Other than the $ 50, Mr. Lombard informed the Court that this income came not from cash receipts but were his estimates of the value of labor performed by his tenants. This indicates some undefined understanding between Mr. Lombard and his prospective tenants, that future lessees invested their labor and time making structures habitable, putting up signs, and generally preparing the Dixie structures for business in such a way that they would not become liable to Mr. Lombard for startup expenses. Petitioners reported the following expenses related to the Dixie in 1984 and 1985: Item
1984
1985
Advertising
$     48 $     -- Auto and travel
1,037 2,722 Insurance
365 738 Interest
5,210 7,924 Legal and professional fees
847 -- Repairs
398 102 Supplies
1,837 9,058 Taxes
533 -- Utilities
384 -- Wages and salaries
809 7,933 Other
219 -- Depreciation
5,951 12,126 Total
($ 17,638)
($ 40,603)
*174 Respondent disallowed the losses generated by the above deductions to the extent they exceeded reported income. Respondent allowed Schedule A interest as indicated below; however, as shown, the combined interest claimed by petitioners on Rosewood and for the Dixie activities exceeded respondent's allowances: Year
1984
1985
Farm-claimed
$ 15,803 $ 18,636 Dixie-claimed
5,210 7,924 Total interest
petitioners claimed
$ 21,013 $ 26,560 Less interest
respondent allowed
($ 19,678)
($ 18,630)
Interest disallowed
$ 1,335 $ 7,930 OPINION 1. 1314 Innes Sale and Petitioners' Loss on Buyer's Note
Section 166 allows a deduction for debts that become wholly worthless within the year. Respondent argues that petitioner is not entitled to a bad debt deduction where the loss relates to an item of income which has never been reported. Gertz v. Commissioner, 64 T.C. 598, 600 (1975); sec. 1.166-1(e), Income Tax Regs. Petitioners accepted unsecured notes from their buyer, Brown, as part of the purchase price on the 1981 sale of their 1314 Innes property. Petitioners became aware of Brown's default soon after the sale, and *175 they later successfully obtained and recorded a $ 133,436.16 judgment against this buyer. This reflected the amount of principal petitioners lost on the note, as well as the proceeds they failed to receive on the sale of this property; petitioners were never able to collect on this loss. For reasons unexplained in their 1985 return, petitioners claimed $ 3,000 of this $ 133,436.16 judgment as an "other" loss deduction. The question before us is whether petitioners have created a basis for this loss deduction by reporting income related thereto. Petitioners reported their gain from the 1314 Innes sale on Form 4797, Supplemental Schedule of Gains and Losses, apparently choosing to elect out of installment treatment by not filing a Form 6252, Computation of Installment Sale Income, even though proceeds were expected to be received following the year of sale. Petitioners' failure to report the gross selling price and failure to indicate that they were reporting a note at less than its full face value may result in an improper election out of the installment method, thereby having the effect of returning petitioners to the installment method. Sec. 453(d); Bolton v. Commissioner,92 T.C. 303 (1989). *176 Respondent does not question the installment method of reporting this transaction, and our determination is the same regardless of the method used -- installment or regular method. Pursuant to petitioners' cash basis of reporting, they failed to report the full sales price on the 1314 Innes sale, but instead reported a sales price that was net of their $ 133,436 loss due to Brown's defaults in making principal payments on the note. Pursuant to the installment method of reporting under section 453(c), gain is not recognized until payments are received and because no payments were ever recovered from Brown on the judgment or the defaulted amount of the note, petitioners did not and never would report gain which corresponded to the $ 133,436 loss. Due to this failure of income inclusion under either method, petitioners never created a basis on which a later bad debt deduction could be claimed. As such, there is no need to discuss the worthlessness of the above debt. 2. Rosewood Farm
Whether petitioners may deduct Rosewood's claimed farm expenses beyond the income they derived therefrom requires petitioners to have honestly and objectively entered into their farming activities *177 with the continued and primary objective of generating a profit. Sec. 183; Engdahl v. Commissioner, 72 T.C. 659, 666 (1979). In pursuing such a determination, we are understandably guided by, and give greater weight to, objective facts and circumstances than to a taxpayer's statement of intent. No one factor or group of factors is determinative as each case turns on its uniquely generated set of facts; however, petitioners bear the usual burden of proving the facts which support this requisite profit motive. Rule 142(a); Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). The nonexclusive list of factors most frequently considered is given in section 1.1832(b), Income Tax Regs. The factors include: (1) The manner in which the taxpayer carries on the activity; (2) the experience of the taxpayer or his advisers with respect to the activity; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that an asset used in the activity may appreciate in value; (5) the success of the taxpayer in *178 carrying on the same or similar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of profits, if any, that are earned; (8) the financial status of the taxpayer; and (9) the elements of personal pleasure or recreation enjoyed by the taxpayer from his involvement in the activity. To be sure, petitioners did not seek to avoid taxes by acquiring Rosewood, and they were not hobby farmers involved in sheltering large amounts of income derived from other sources. To the contrary, petitioners dissipated their net worth in an honest attempt to succeed at several ventures simultaneously. The Lombard family survived this period principally on income from Mr. Lombard's temporary jobs and pension income which ranged from a combined low of $ 10,682 in 1984 to a high of $ 31,506 in 1985. Mr. Lombard left the security of a tenured position and an apparently handsome home in California to move to Virginia with the objective of providing something secure for his much younger wife, recognizing that her skills were limited and endeavoring to provide her with a means of support through his retirement years and beyond. Mr. Lombard had apparently *179 experienced some successes in California with several real estate ventures through his rehabilitation efforts in improving property values, subsequently realizing gains upon sale. Mr. Lombard's decision not to place all of the family savings into one endeavor (Rosewood), but to spread the risk by also investing in the Oakhurst and the Dixie properties, which were similar to his past successes (the Innes properties), was seemingly cautious. Unfortunately, due to several financial surprises, this spreading of risk also spread petitioners' finances too thin. Petitioners planned for Rosewood to operate debt free, but unforeseeable events diverted intended funds away from Rosewood: the unexpected and sizable 1979 tax liability created by an intended-but-failed section 1031 likekind exchange between the two Innes properties and the Oakhurst complex, and the resulting forced sale of the last Innes property, wherein petitioners suffered a significant financial loss due to their buyer's default and the subsequently unrecoverable judgment. These circumstances occurred subsequent to petitioners' 1978 and 1979 purchases of Rosewood, the Oakhurst, and the Dixie properties. These miscalculations *180 forced petitioners to revise their initial intentions of retiring Rosewood's debt after the exchange to a plan that would instead retire the farm's debt as Oakhurst rental units were sold. The record reveals no evidence of pleasurable amenities on the farm. We also do not question the labor involved in running a farm, particularly Mr. Lombard's effort in clearing the fields and storing 500 to 700 bales of hay per year. Petitioners were not frivolous, and they did not have the wherewithal to long afford the losses generated by Rosewood. They produced, instead of purchased, much of the feed (hay) for their anticipated operation. Mr. Lombard was also apparently capable in six or seven crafts, which helped him to repair and run almost anything on the farm. Detrimental to petitioners' for-profit claim is the fact that Mrs. Lombard discontinued any effort towards maintaining an adequate set of books and records for Rosewood after becoming discouraged by its obvious lack of income. Petitioners also did not maintain separate accounts for this activity, and although Mr. Lombard professed his caution regarding financial matters, he did not produce any income projections for Rosewood *181 other than stating that he had the greatest confidence in his wife's abilities as a farmer, a fact which was not demonstrated in this record. Mr. Lombard believed that organic beef farming would bring a higher price than nonorganically produced beef; however, he did not produce any evidence to this effect, and even taking this assertion as fact, petitioners acknowledged that a ready market did not exist for their product, to the extent that they felt the need to create their own market by purchasing the Dixie and renovating it into a store or restaurant so as to market Rosewood beef (it apparently never happened). Mr. Lombard did not have any prior farming experience, and Mrs. Lombard's experiences were apparently in her youth and not fully developed by the record. Referring to Mrs. Lombard's raising of rabbits, Mr. Lombard stated he believed that if you have raised one type of farm animal, you are capable of successfully raising all kinds of farm animals. While we have some doubt about this proposition, we have no doubt that organic farming requires specialized knowledge. There is no proof either petitioner had this knowledge. We do not know the essentials of petitioners' cattle *182 operation, how they operated, or rather how they expected to operate, the type of cattle they raised, whether they used the natural increase method of production, the number of cattle required for them to break even, the expected number of years to develop a herd sizable enough to break even, whether their acreage was sufficient, the number of births, deaths, purchases, and sales of cows and calves each year. For all we know, petitioners were more successful than their cows at producing offspring. During the 6 years between 1979 and 1985, petitioners' livestock inventory increased from three or four cows to just nine. To the extent we remain uninformed, petitioners have failed in their burden of proof. Rule 142(a). At trial, Mrs. Lombard did not testify; significantly and unfortunately, we do not have information for the years involved regarding the amount and character of time and effort Mrs. Lombard devoted to farming or towards her education in the field of organic farming. The record indicates that petitioners' three and four children (at that time) were not yet of school age by 1984 and 1985, the years in issue; therefore, without more information, we would have to find *183 that during this time Mrs. Lombard cared for and was predominately committed to her children. Mr. Lombard predominately committed his efforts and the family's resources towards the improvement of Rosewood, Oakhurst (at least until its sale in November 1984), and the Dixie properties. However, after several years of farm losses and the birth of several children, petitioners apparently realized that Mrs. Lombard could not operate the farm profitably without Mr. Lombard's assistance, and Mr. Lombard agreed to quit a job, which was bringing in more income than he had earned in the past 6 years, so that Mrs. Lombard (the ostensible farmer) could get out of the house to care for the cattle. However, this change of course was not taken until 1986, subsequent to the years in issue. This lack of commitment to Rosewood during the years in issue is also supported by an almost total lack of sales. Petitioners' sales of cattle were so few that they averaged a mere $ 219 per year for the 7 years we have figures. Also significant is the fact that on more than one occasion, the chief organic farmer for the area encouraged petitioners to get productive. This suggests not only some demand for *184 the product but also that petitioners lacked know-how, or the necessary commitment to the farm. Petitioners' financial setbacks, while unexpected, occurred well before the years in issue and are not sufficient to overcome the lack of commitment to Rosewood during the years here. While we recognize that the Lombard children presented Mrs. Lombard with a nearly impossible situation, the situation was of petitioners' own making. Mr. Lombard's absences, and his many other activities, in addition to the birth of several children, suggest a lack of commitment and a lack of income for Rosewood, which is determinative of a lack of profit motive. The factors we see here do not demonstrate a continued and primary objective of operating profitably within the meaning of section 183. See sec. 1.183-2(b), Income Tax Regs.
3. Gross Profit on Oakhurst Apartment Sale
In calculating the gross profit on petitioners' installment sale of the Oakhurst, we must determine its selling price and adjusted basis. Gross profit is a property's contract price less its adjusted basis. Adjusted basis includes selling expenses as well as commissions. Contract price is the selling price reduced by *185 qualifying indebtedness. The contract of sale on the Oakhurst did not include any qualifying indebtedness; therefore, the contract price here is the same as the gross selling price. Selling price is the gross selling price without reduction for any encumbrances or selling expenses. Sec. 15A.453-1(b)(2), Temporary Income Tax Regs. In calculating their gross selling price, petitioners argue that the $ 488,000 contract price on the 1984 sale of the Oakhurst should be reduced to $ 478,000 to reflect the $ 10,000 discount in price, which occurred in 1986 subsequent to the year of sale when the parties agreed to a prepayment of the $ 95,000 bond for $ 85,000. Here, the gross selling price is the total $ 488,000 purchase price agreed to between the parties as it appeared on the contract of sale. The subsequent renegotiation between the parties and the reduction in this price occurred in 1986, which was 2 years following the year of sale and subsequent to the years in issue. Petitioners cannot retroactively seek a recalculation of their selling price and the gross profit based on events which occurred following the year of sale. See Cox v. Commissioner,62 T.C. 247, 255 (1974). *186 The selling price on this installment sale remains at respondent's figure of $ 488,000. We need not address any potential gross profit recalculation for the year 1986 based on these changed circumstances as that year is not before us. Petitioners also argued that they are entitled to the full $ 29,280 commission as stated in the contract of sale, thereby further increasing their adjusted basis by $ 5,300. Petitioners' statement of costs, however, indicated that the full commission was reduced by this disputed amount pursuant to the parties' agreement. While we readily admit that realtors are rumored to be at least as interested in receiving their full commissions as anyone else is interested in their paychecks, Mr. Lombard's statements that he exchanged two Cadillacs in lieu of $ 5,300 cash are unsupported by any corroborating documentary proof regarding his ownership, cost, or the value of these vehicles. Mr. Lombard's testimony is simply insufficient to carry his burden of proof and any additional documents attached to his brief are simply untimely as they were not properly stipulated before trial or admitted during trial pursuant to the Federal Rules of Evidence. Rules 142(a), *187 143(b). Respondent's calculation of gross profit, including the stipulated additions to adjusted basis, is sustained. 4. Travel To and From the Oakhurst
For the year 1984, petitioners claimed $ 6,280 in transportation expenses relating to the Oakhurst on their Schedule E, Supplemental Income Schedule; respondent disallowed $ 3,212 of this amount due to petitioners' failure to substantiate any more than the $ 3,068 allowed. While it is clear from the record that Mr. Lombard traveled extensive distances to and from petitioners' different properties and his intermittent job locations, he has failed to give this Court any information other than his admission that the amount of the deduction he claimed was a mere estimate of his travel expenses and the broad statement that he was constantly on wheels. As a result, Mr. Lombard has again totally failed to carry his burden of proof by not providing this Court with any adequate information on which to determine if he was entitled to such additional transportation expenses. Rule 142(a). Respondent's determination is sustained. 5. The Dixie
Startup expenditures are those nondeductible expenses which are paid or incurred *188 to investigate, create, or acquire an active trade or business, or which are incurred before the day on which the active business begins. Sec. 195(a),(c)(1). Capital expenditures are not presently deductible as they include the cost of acquiring or constructing buildings, machinery and equipment, furniture and fixtures, and similar properties which have a useful life or which increase the value of such properties substantially beyond 1 year. Sec. 263(a), sec. 1.263(a)-1 and -2, Income Tax Regs. To amortize or depreciate either of these expenditures, and to presently deduct other expenses associated with an activity over and above the income derived therefrom, a taxpayer must be engaged in an active trade or business for profit. Secs. 162(a), 183, 195(b)(1). The same for profit factors delineated above for Rosewood apply here as well. [2]
*189 Contrary to petitioners' suggestions, none of petitioners' activities (the Oakhurst, the Dixie, or Rosewood) were sufficiently interrelated to constitute a single activity for the purpose of determining whether petitioners were engaging in a trade or business. Sec. 1.183-1(d)(1), Income Tax Regs. Here, farming and the rental of property are without question unrelated, and we cannot determine in what activity or activities the Dixie will eventually be engaged. Petitioners argue that the Dixie's availability during renovations allowed valuable space at the Oakhurst to be freed up and rented, thereby increasing the Oakhurst's profitability. While this may be true, this fact alone is not sufficient to treat these activities as a single enterprise, and it is also insufficient to find that at the Dixie there was a trade or business. Petitioners' decision to increase the profitability of the Oakhurst (the only property producing income during this period) by utilizing the unused space at the Dixie during its rehabilitation period in an effort to provide more funds to implement their plans for Rosewood and the Dixie, does not prove that the activities were economically interdependent. *190 It only proves that petitioners were intelligently utilizing their resources given their financial situation at the time. As far as the farm is concerned, even though petitioners envisioned the Dixie as a retail outlet for the farm, such economic interdependence did not yet exist. Moreover, petitioners themselves accounted for each of these activities separately on their tax returns. Petitioners insist that the Dixie was a profit-making activity for the years in issue; however, they have failed to prove that the Dixie had progressed beyond the development stage. Expenses incurred in preparation for engaging in a business at some future time are not currently deductible. Sec. 162; Graybeal v. Commissioner, T.C. Memo. 1979-506. We note initially that the record is sketchier regarding the Dixie than for either Rosewood or the Oakhurst, and petitioners have again failed in their burden of proof to the extent we lack such information. [3]Rule 142(a). The evidence is also contradictory; we are unclear whether petitioners intended to make money by renting Dixie's rehabilitated structures or by performing services to the public, such as the picture framing *191 Mr. Lombard engaged in, or both. We wonder why the three businesses that temporarily occupied the habitable portion of the Dixie since 1980 have not produced any rental receipts. For the Dixie, the lack of habitability and income are determinative. The few hundred dollars petitioners reported as receipts were not rental income from lessees but an estimate of the value of services performed by future tenants. The tenants evidently were involved in the rehabilitation work and were not yet paying rent to Mr. Lombard because the structures were not yet habitable. Mr. Lombard readily admits that the Dixie was a long-term endeavor on which rehabilitation efforts were ongoing. The nature of the expenditures incurred indicates that they were predominately improvements which increased the life and value of the Dixie's structures; therefore, they were capital in nature and were not presently deductible. Petitioners have not proven that the Dixie advanced beyond this early development stage by the end of 1985. *192 6. Dixie's Rehabilitation Credit
While we believe that petitioners have been actively rehabilitating the Dixie, we cannot determine from this record that petitioners are entitled to the section 46(a)(3) investment credit. The record contains no information regarding the age of the Dixie or whether the repairs were of a qualifying character and properly substantiated pursuant to section 48(g). In addition, if property cannot be depreciated because there is no present profit motive to engage in a trade or business, the investment credit cannot be claimed. Pike v. Commissioner, 78 T.C. 822, 841 (1982), affd. without published opinion 732 F.2d 164 (9th Cir. 1984). Respondent's disallowance is sustained. 7. Additions to Tax
Respondent determined additions to tax pursuant to section 6653(a)(1) and (2) in the years 1984 and 1985. Respondent also determined an addition to tax pursuant to section 6661 for the year 1985 alone. Petitioners continue to have the burden on every issue to show error in respondent's determinations. Luman v. Commissioner, 79 T.C. 846, 860-861 (1982). *193 Section 6653(a)(1) imposes an addition of 5 percent of the underpayment if any part of any underpayment was due to negligence or intentional disregard of rules and regulations. Section 6653(a)(2) imposes a further addition of 50 percent of the interest payable on the portion of the underpayment attributable to negligence or intentional disregard of rules and regulations. Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Section 6661 imposes a 25 percent addition [4] to tax on taxpayers who substantially understate their tax by an amount which exceeds the greater of $ 5,000 or 10 percent of the tax required to be shown on taxpayer's return. Petitioners' understatement for 1985 exceeds these threshold figures. An understatement can, however, be reduced where a taxpayer has adequately disclosed the relevant facts on his return, or in a statement attached thereto, or if there is substantial authority for the taxpayer's treatment of any item. Sec. 6661(b)(2)(A)(i) and (ii). The weight of authorities in support of a taxpayer's *194 position must be substantial compared to the weight of authorities contrary to his position. Sec. 1.6661-3(b)(3), Income Tax Regs.
Following concessions, respondent has been sustained herein on all disputed issues. Although the farm issue led to some discussion, the determination was not close. All other positions taken by petitioners are totally unsupported by any authority. Also, the mere fact that petitioners reported their Rosewood and Dixie activities on Schedules E and F does not constitute adequate disclosure. Schirmer v. Commissioner, 89 T.C. 277, 284-286 (1987). Petitioners' returns for 1984 and 1985 are so deficient *195 it is no wonder they were questioned by respondent. The returns show numerous gross mathematical errors indicating Mr. Lombard's lack of care regarding his arithmetic, they are handwritten in an extremely sloppy manner and in many places very difficult to read (indicating a near disdain for the obligation to file returns), and they are incomplete. Required forms are missing, most notably Form 6252, Installment Sales, and Form 4562, Depreciation and Amortization. The presentment of such returns failed to adequately disclose much, if anything, to respondent including the controversies involved herein. Petitioners have been negligent in many respects, primarily in failing to seek professional assistance regarding the tax implications and the proper method of reporting the complexities involved in petitioners' numerous activities and transactions. If petitioners could not afford a C.P.A. or an attorney during this period of time, respondent offers many educational assistance programs to taxpayers at no charge, including walk-in, telephone, and informational publications, as well as volunteer assistance programs whereby individuals educate and assist taxpayers in preparing their returns. *196 [5] Although petitioners did attempt to duplicate a prior year return which had been prepared by a C.P.A., petitioners' numerous mistakes make it abundantly evident that petitioners have a limited understanding of tax law which seems to emanate from a "gut feeling" approach to determining what should be taxable rather than a knowledge of what is taxable and how to properly report it; i.e., oportet hoc esse, ergo hoc est. Petitioners have not shown error in respondent's determination; respondent is sustained on these additions to tax. Decision will be entered under Rule 155. Footnotes
1. 50 percent of the interest due on the deficiency.↩
1. Petitioners conceded they inadvertently failed to report patronage dividend income for 1985 in the amount of $ 69 that was received from Augusta Co-op Farm Bureau, Inc. Petitioners also conceded that their adjusted gross income for 1985 exceeded the 10 percent and $ 100 thresholds of sec. 165(h)(1) and (2), in claiming a $ 381 casualty loss deduction due to credit card fraud.↩
1. Respondent initially disallowed all claimed real estate commissions and selling expenses; however, respondent subsequently conceded that petitioners were entitled to selling costs totaling $ 14,466. Petitioners' closing statement and statement of costs indicated costs totaling $ 7,466. Respondent allowed an additional $ 7,000.↩
2. Per petitioners' tax returns from 1979 through 1983, the Oakhurst's depreciable basis increased with improvements totaling $ 19,369. Respondent disallowed $ 3,342 of this total which reflected petitioners' claimed additions for the attic apartment and the purchase of used furniture during the years 1982 and 1983. Respondent ultimately stipulated to these $ 3,342 additions, as well as additional costs of $ 5,000, which combine to increase the basis additions on the Oakhurst to the total $ 24,369 figure indicated above.↩
2. We refer petitioners to two cases that are substantially similar to their situation. Swigart v. Commissioner, T.C. Memo. 1980-379; Graybeal v. Commissioner, T.C. Memo. 1979-506↩.
3. Petitioners attempted to remedy this shortfall by attaching documents to their brief. Evidence must be submitted at trial; documents attached to briefs and statements made therein are not evidence, and additional claims made on brief will not be addressed. Rule 143(b); Olbrycht v. Commissioner, T.C. Memo. 1966-249↩.
4. The sec. 6661 addition was increased from 10 percent to 25 percent by the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, sec. 323, 96 Stat. 324, 613, for returns due after 1982 and before Jan. 1, 1990, on underpayments assessed after Oct. 21, 1986. Sec. 6661(a); Pallottini v. Commissioner, 90 T.C. 498↩ (1988).
5. We suggest petitioners order respondent's Publication No. 910, Guide to Free Tax Services.↩